UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Case No. 22-2210

MEGAN DANIELS,
CHRIS DANIELS and
BETSY DANIELS,

   Plaintiffs-Appellants,

v.

UNITED HEALTHCARE SERVICES, INC. and
UNITED BEHAVIORAL HEALTH,

   Defendants-Appellees.

**On Appeal from U.S. District Court (W.D.-Wis.) Case No. 3:19-cv-1038**
**The Honorable William M. Conley Presiding**

**BRIEF AND STIPULATED JOINT APPENDIX OF PLAINTIFFS-APPELLANTS,**
**MEGAN DANIELS, CHRIS DANIELS AND BETSY DANIELS**

GINGRAS, THOMSEN & WACHS
Robert J. Gingras
WI State Bar No. 1002909
Lynn R. Laufenberg
WI State Bar No. 1016236
8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
gingras@gtwlawyers.com
laufenberg@gtwlawyers.com
Attorneys for Plaintiffs-Appellants

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2210

Short Caption: Megan Daniels, et al. v. United Healthcare Services, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Megan Daniels, Betsy Daniels and Chris Daniels

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gingras, Thomsen & Wachs

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Robert J. Gingras                    Date: 7/21/2022

Attorney's Printed Name: Robert J. Gingras

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address: Gingras, Thomsen & Wachs

8150 Excelsior Dr., Madison, WI 53717

Phone Number: 608-833-2632                    Fax Number: 608-833-28774

E-Mail Address: gingras@gtwlawyers.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... 5

JURISDICTIONAL STATEMENT ............................................................ 7

STATEMENT OF THE ISSUES ................................................................ 7

STATEMENT OF THE CASE .................................................................... 8

   COURSE OF PROCEEDINGS – PROCEDURAL BACKGROUND. ....................... 8

      *a. Allegations and Claims Made in the Amended Complaint.* .................. 9

      *b. United Healthcare's Position in Support of its Motion to Dismiss.* .................. 12

      *c. The Daniels' Response to the Motion to Dismiss.* ................................. 13

      *d. Provisions of the Plan Document.* ........................................................ 13

   DISPOSITION OF THE U.S. DISTRICT COURT, WESTERN DISTRICT OF WISCONSIN, THE HONORABLE WILLIAM M. CONLEY PRESIDING. ................................. 16

SUMMARY OF THE ARGUMENT .......................................................... 17

STANDARD OF REVIEW ......................................................................... 18

ARGUMENT ................................................................................................ 19

WISCONSIN LAW EXTENDS THE DUTY OF GOOD FAITH AND FAIR DEALING TO AGENTS OF ENTITIES HAVING A FIDUCIARY RELATIONSHIP WITH BENEFICIARIES, WHETHER ARISING FROM CONTRACT OR STATUTE. ................................................................. 19

      *Wisconsin courts have long held that the agent of a party with the obligation to pay benefits has the same fiduciary duty of good faith and fair dealing toward the beneficiary.* .............................................................................. 20

      *Wisconsin Courts have consistently extended the duty of good faith and fair dealing in "first party cases" beyond the traditional insurance relationship.* ..................... 23

*Contrary to the District Court's ruling, Roehl does not support the proposition that direct "insurance" relationship is necessary to the duty of good faith and fair dealing in the first party context.* ............................................................................... 27

**REVERSAL OF THE ORDER DISMISSING THE DANIELS' BAD FAITH CLAIM WILL DISPOSE OF THE MOTION WITH RESPECT TO THE PUNITVE DAMAGE CLAIM.** ..................................................................... 28

**DISMISSAL OF THE BREACH OF CONTRACT CLAIM WILL NOT PRECLUDE THE DANIELS FROM RECOVERING DENIED BENEFITS AS AN ELEMENT OF DAMAGE IN THEIR BAD FAITH CLAIM.** .................................. 28

**DISMISSAL OF THE BREACH OF CONTRACT CLAIM DOES NOT REQUIRE DISMISSAL OF THE CLAIM FOR WIS. STATS. § 628.46 INTEREST.** ............. 29

**CONCLUSION** ........................................................................... 30

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT** ................... 31

**STATEMENT ON REQUIRED MATERIALS** ............................................ 32

**STIPULATED JOINT APPENDIX OF PLAINTIFFS-APPELLANTS** ................... 33

**TABLE OF CONTENTS OF APPENDIX** .................................................. 34

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

<u>CASES</u>

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012) 17

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed. 206 (1985) ...... 20

*Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978) ... 18, 19, 22, 24

*Aslakson v. Gallagher Bassett Servs.*, 2007 WI 39, 300 Wis.2d 92, 729 N.W.2d 712 .... 12, 15, 18, 19, 23, 25, 26, 27

*Augutis v. United States*, 732 F.3d749 (7th Cir. 2013) ..................................................... 17

*Coleman v. American Universal Insurance Co.*, 86 Wis.2d 615, 273 N.W.2d 22 (1979) 18, 23, 25, 26

*Craft v. Economy Fire & Casualty Co.*, 572 F.2d 565 (7th Cir. 1978) ............................ 23

*D.L. v. Huebner*, 110 Wis.2d 581, 329 N.W.2d 890 ........................................................ 20

*Doemer v. Callen*, 847 F.3d 522 (7th Cir. 2017) ............................................................. 17

*Duir v. John Alden Life Ins. Co.* , 573 F.Supp. 1002 (W.D.Wis. 1983) ........................... 22

*Ferris v. Location 3 Corp.*, 2011 WI App. 134, 804 N.W.2d 822 ................................... 21

*Golden v. State Farm Mut. Auto Ins. Co.*, 745 F.3d 252 (7th Cir. 2014) ........................ 17

*Grand Sheet Metal Prod. Co. v. Protection Mutual Ins. Co.*, 34 Conn.Supp. 46, 375 A.2d 428 (1977) ...................................................................................................................... 23

*Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 521 P.2d 1032 (1973) ................................................................................................................................. 19

*Hammer v. DILHR*, 92 Wis.2d 90, 284 N.W.2d 587 (1979) ............................................ 21

*In re Estate of Steffke*, 116 Wis.2d 199, 222 N.W.2d 628 (1974) ................................... 20

*Jones v. Secura Insurance Company*, 2002 WI 11, 249 Wis.2d 623, 638 N.W2d 575 .... 28

*Kontowicz v. American Standard Ins. Co.*, 2006 WI 48, 290 Wis.2d 302, 714 N.W.2d 105 .................................................................................................................................... 28

*Kranzush v. Badger State Mutual Casualty Co.*, 103 Wis. 2d 56, 73, 307 N.W.2d 256 (1981) ................................................................................................................ 20, 26, 27

*Lueck v. Aetna Life Ins. Co.*, 116 Wis.2d 199, 222 N.W.2d 628 (1984)..19, 20, 21, 22, 26, 27

*McEvoy Finn v. Group Health Cooperative of Eau Claire*, 213 Wis.2d 507, 570 N.W2d 397 (1997) ............................................................................................. 22, 23, 25, 26

*Michalowicz v. Vill. Of Bedford Park*, 528 F.3d 530 (7th Cir. 2008) .............................. 17

*Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis.2d 683, 273 N.W.2d 285 (1979)............ 21

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629 (7th Cir. 2007)......................................... 17

*Poling v. Wisconsin Physicians Service*, 120 Wis.2d 603, 357 N.W.2d 293 (Wis. App. 1984)................................................................................................................ 22, 25, 26

*Rodas v. Seidlin*, 656 F.3d 610 (7th Cir. 2011) .............................................................. 17

*Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, 325 Wis.2d 56, 784 N.W.2d 542 ................................................................................. 15, 18, 24, 25, 26, 27

*Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, 308 Wis.2d 103, 746 N.W.2d 762 ................................................................................................................ 21

*Wisconsin Physicians Service Ins. Corp. v. Mitchell*, 114 Wis.2d 338, 338 N.W.2d 326 (Ct. App. 1983) ...................................................................................................... 28

## STATUTES

28 U.S.C. § 1291 ........................................................................................................... 6

28 U.S.C. § 1332(a) ................................................................................................. 6, 7

28 U.S.C. § 1441 ...................................................................................................... 6, 7

Wis. Stats. § 628.46 .......................................................................... 11, 12, 16, 28, 29

## JURISDICTIONAL STATEMENT

The District Court had diversity jurisdiction of this civil action under the laws of the United States pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441, this being a case alleging breach of contract, bad faith, and a failure to timely pay benefits owing filed on behalf of the Plaintiffs-Appellants, Meghan Daniels, Betsy Daniels and Chris Daniels, against Defendants-Respondents United Healthcare Services, Inc. and/or United Behavioral Health, third-party administrators of a Plan sponsored by the School District of South Milwaukee. Plaintiffs-Appellants are citizens of the State of Wisconsin. Defendant-Appellee United Healthcare Services, Inc. (UHS) was incorporated in the State of Minnesota and has its principal place of business in the State of Minnesota. Defendant-Appellee United Behavioral Health (UBH) was incorporated in California and operates its principal place of business in San Francisco, California. The amount in controversy exceeds $75,000.

This is an appeal pursuant to 28 U.S.C. § 1291 from an Opinion and Order filed on June 13, 2022, which granted the Motion of the Defendants-Respondents under FRCP 12(b)(6) dismissing the Complaint of the Plaintiffs-Appellants in all respects. A judgment was filed on June 14, 2022. The Plaintiffs-Appellants' Notice of Appeal was filed on July 11, 2022.

## STATEMENT OF THE ISSUES

**ISSUE NO. 1:**    Whether, under Wisconsin law, the corporate administrator of an employer's health plan which has been delegated full discretion and authority to

determine entitlement to benefits can be held liable to an employee/beneficiary for breach of contract and in tort for bad faith for wrongful exercise of that authority.

**ANSWERED BY THE COURT:**          No.

**STATEMENT OF THE CASE**

**I.    Course of Proceedings – Procedural Background.**

The Plaintiffs-Appellants, Megan Daniels, Betsy Daniels and Chris Daniels (hereafter "Daniels") filed this bad faith and breach of contract action against United Healthcare Services, Inc., (hereafter "United Healthcare") on November 15, 2019, in Circuit Court for Dane County. They sought damages for failure to provide mental health benefits claimed owing under the "UHC School District of South Milwaukee Health Plan." On December 18, 2019, United Healthcare removed the action to the United States District Court for the Western District of Wisconsin, invoking diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1441. (Dkt. 6). On January 16, 2020, United Healthcare filed a 12(b)(6) Motion to Dismiss, asserting that because it was a third-party administrator of the subject Plan, and therefore did not have "privity" with the Daniels, it could not be liable for damages for breach of contract and bad faith. (Dkt. 9 & 10)

On February 6, 2020, the Daniels filed an Amended Complaint adding United Behavioral Health as a party defendant and including additional relevant factual allegations. (A.App. 113-126) On the same date, they filed a Brief opposing the Motion to Dismiss on the ground that it was rendered moot by the filing of the Amended Complaint. (Dkt. 13) On March 3, 2020, Defendants filed their 12(b)(6) Motion to Dismiss the Amended Complaint and supporting Brief. (Dkt. 20 & 21) The Brief renewed arguments

set forth in the original Motion to Dismiss. The Brief was accompanied by an Affidavit and Plan Document. (Dkt. 22, 22-1)

On March 24, 2020, the Daniels filed their Brief in Opposition to the Motion to Dismiss which included a request that the Plan Document be stricken. (Dkt. 23) On April 3, 2020, United Healthcare filed its Reply Brief. (Dkt. 24) On May 15, 2020, the Daniels filed a "Notice of Supplemental Authority" which referenced additional provisions of the Plan. (Dkt. 25) On May 22, 2020, United Healthcare filed a Motion and Supporting Brief requesting that the Court strike the Notice of Supplemental Authority. (Dkt. 26, 27) The Daniels responded to this Motion on June 5, 2020. (Dkt. 28)

On April 26, 2022, the District Court entered an Order requesting supplemental briefing on whether the subject Plan was subject to ERISA and its preemption provisions. (Dkt. 37) On May 10, 2022, United Healthcare filed its Supplemental Brief acknowledging that because the Plan was issued by a governmental entity it is not subject to ERISA. (Dkt. 38) In light of this acknowledgment, the Court issued an Order on May 11, 2022, excusing the Daniels from filing a Supplemental Brief on this issue. (Dkt. 39) On June 13, 2022, the District Court issued its Decision and Order granting United Healthcare's Motion to Dismiss in all respects. (A.App. 101-111) A Judgment effectuating that Order was entered on June 14, 2022. (A.App. 112) The Daniels filed their Notice of Appeal on July 11, 2022. (Dkt. 42)

### a. Allegations and Claims Made in the Amended Complaint.

By their Amended Complaint, the Daniels made the following allegations of fact:

Plaintiffs Chris and Betsy Daniels are employees of the South Milwaukee School District. Am. Compl. (A.App. 115). Chris is a Work-Based Learning Coordinator and Betsy is a Library Media Specialist. *Id.* Plaintiff Megan Daniels is their minor daughter. (A.App. 114). The Daniels family receives health insurance coverage under their contract for insurance, titled "UHC's School District of South Milwaukee Choice Plus Plan 1" ("the Plan"). (A.App. 115). Either or both of Defendants United Healthcare ("UHC") and United Behavioral Health ("UBH") decide whether to provide coverage for health care under the Plan. (A.App. 116)

Megan has a history of mental health concerns that includes three suicide attempts prior to February 2017. (A.App. 116, ¶ 15-17). In February 2017, Megan's boyfriend overdosed on prescription drugs that were used to treat his own mental health concerns. (A.App. 116, ¶ 18). Thereafter, Megan began experiencing insomnia, panic attacks, crippling anxiety, and severe depression with suicidal ideation. (A.App. 116, ¶ 19) Due to their daughter's significant mental health problems, Chris and Betsy researched for and were fortunate to find a suitable inpatient treatment center, the Nashotah Program and Rogers Memorial Hospital ("Nashotah"). (A.App. 116, ¶ 20-23) The Defendants approved coverage for Megan's first 24 days of treatment but then informed Chris and Betsy that Megan was no longer "at imminent risk of harm to self or others," so they were ending coverage for her treatment. (A.App. 116-117, ¶ 27) The Defendants' position on Megan's health directly contravened all determinations of Megan's health care providers, who found Megan needed the program to avoid the clear and present risk of suicide. (A.App. 117-118, ¶ 28, 44) Although the Defendants discontinued coverage for Megan's care, Chris and

Betsy knew she needed to remain in treatment, so they shouldered the cost of treatment, about $1,000 per day, while pursuing appeals with the Defendants. (A.App. 117, ¶ 29-30)

The Defendants repeatedly sent Chris and Betsy rejection letters denying coverage based on the "UBH Level of Care Guideline," although the Plan's terms state coverage is provided if services are "medically necessary" and Megan's physicians advised the Defendants that Megan exhibited behaviors that put her at risk of suicide and she could not go home. (A.App. 117-118, ¶ 32-35, 44) "Medically necessary" is defined, in part, as being in accordance with generally accepted standards of care. (A.App. 117, ¶ 35) However, the UBH Level of Care Guideline violates the generally accepted standards of care, which taints the coverage decision and violates the terms of the Plan. (A.App. 117, ¶ 35, 36)

Chris and Betsy received the rejection letters from UBH; each rejection letter had UBH's insignia at the top. (A.App. 117-118, ¶ 37) The bottom of each letter states "Insurance coverage provided by United HealthCare Services, Inc." (A.App. 118, ¶ 38) The letters insisted Megan's treatment was not covered because she did not present with a risk of harm. (A.App. 118, ¶ 39) Suspicious, Chris and Betsy requested and received the Defendants' records of their consideration of Megan's coverage. (A.App. 118, ¶ 40, 41)

The records showed Megan's physicians advised the Defendants that Megan's treatment was medically necessary and expressed Megan's significant risk of harm. (A.App. 118, ¶ 44) Megan's physician also advised the Defendants that the average stay for treatment in the program is 80 days, far greater than the 24 days approved by the Defendants. (A.App. 119, ¶ 45) The Plaintiffs submitted a final appeal composed of about

500 pages of relevant materials; the Defendants denied this appeal only one day after receiving it. (A.App. 119, ¶ 49-50)

Based on these allegations, the Daniels sought benefits owing by reason of breach of contract, compensatory and punitive damages for United Healthcare's bad faith, and interest on the amounts owing in benefits under Wis. Stats. § 628.46.

### b. United Healthcare's Position in Support of its Motion to Dismiss.

In its Brief in Support of its Motion to Dismiss (Dkt. 21), United Healthcare referenced the Summary Plan Document (SPD) which had been separately filed, though not attached to the Daniels' Complaint. It pointed out that it was the third-party administrator by reason of arrangement with the Plan sponsor, the School District of South Milwaukee. It asserted that the Plan was self-funded by the School District and that the SPD provided that the School District "is solely responsible for paying benefits." It sought dismissal of the Breach of Contract claim on the ground that there was no contractual relationship between it and the Daniels – that the only "contractual" relationship was between the Daniels and the Plan. It contended that it could not have any liability on the breach of contract claim as the Plan's agent because the Plan was a "disclosed" principal.

United Healthcare also contended that it could have no liability on the bad faith claim because it was a third-party administrator, not an insurer, and there was no insurance relationship with the Daniels. United Healthcare asserted that the claim for interest under Wis. Stats. § 628.46 and the claim for punitive damages must also be dismissed because United Healthcare was not an "insurer" and, absent the bad faith claim, the punitive damages claim could not be "free standing."

### c. The Daniels' Response to the Motion to Dismiss.

In their Brief opposing the Motion to Dismiss their Bad Faith claim (Dkt. 23), the Daniels referenced the decision of the Wisconsin Supreme Court in *Aslakson v. Gallagher Bassett Servs.*, 2007 WI 39, 300 Wis.2d 92, 729 N.W.2d 712, holding that the third-party administrator of an Uninsured Employers Fund could be liable in bad faith for its handling of the plaintiff's claim for statutory workers compensation benefits. With respect to the Breach of Contract claim, the Daniels pointed to representations in communications during the claim process that United Healthcare was providing "insurance coverage." The Daniels also pointed to several provisions of the Plan which identified United Healthcare's central role in determining what benefits were due, in screening providers and otherwise facilitating access to Plan benefits. The Daniels pointed to non-ERISA cases which have held that a party granted full authority to administer a plan and determine benefits owing under the plan is a proper party to an action to recover benefits. Because the breach of contract and bad faith claims were supported by controlling law, the Daniels argued that the motion to dismiss the Wis. Stats. § 628.46 interest and punitive damage claims should likewise be denied.

### d. Provisions of the Plan Document.

As noted, United Healthcare filed the complete Summary Plan Document with the District Court. (Dkt. 22-1) That Document contains provisions which describe the nature of the relationship between the School District of South Milwaukee and United Healthcare, the respective roles of each in the administration of the Plan, and instructions to

beneficiaries concerning the submission of claims, appealing denials of claims, and bringing suit to challenge denials.

The parties agreed to excerpts of the SPD to be submitted with this brief's Appendix as part of a Stipulated Joint Appendix. The SPD provides that the Plan's sponsor, South Milwaukee, "share[s] in the cost of the Plan," "is solely responsible for paying Benefits" under the Plan, and "is solely responsible for . . . the timely payment of Benefits." (Dkt. 22-1, p. 10, 13, 119) South Milwaukee is also the "Plan Administrator." (Dkt. 22-1, p. 132) United served as the Plan's third-party "claims administrator. (Dkt. 22-1, p. 10, 124) In that role, United "helps [South Milwaukee] to administer claims" for healthcare coverage. *Id.* at 1. United does not insure or guarantee the Plan's benefits, and it is not responsible for paying those benefits. *See id.* at 1, 110. "United Healthcare . . . does not guarantee any Benefits." *Id.* at 1.

At Page 8 of the Summary Plan Document, however, beneficiaries are advised:

School District of South Milwaukee has delegated to UnitedHealthcare the discretion and authority to decide whether a treatment or supply is a Covered Health Service and how the Eligible Expenses will be determined and otherwise covered under the Plan.

(A.App. 127) "Eligible Expenses are the amount United Healthcare determines that United Healthcare will pay for Benefits." (*Id.*) Other sections identify unique programs that United Healthcare offers under the plan.

Under Section 4 – Personal Health Support, the 2016 SPD states, "UnitedHealthcare provides a program called Personal Health Support designed to encourage personalized, efficient care for you and your covered Dependents." (A.App. 128) Under Section 6 –

Additional Coverage Details, the 2016 SPD states, "If special circumstances exist, UnitedHealthcare may pay Benefits for Emergency air transportation…" (A.App. 130) Section 7 is replete with programs and services provided directly by UnitedHealthcare to the Plaintiffs. (Dkt. 22-1, p. 70-72) ("UnitedHealthcare has a program called Treatment Decision Support… UnitedHealth Premium™ Program… UnitedHealthcare's member website…opens the door to a wealth of health information and convenient self-service tools to meet your needs… UnitedHealthcare provides two programs that identify, assess, and support members over the age of 18 living with diabetes or pre-diabetes." Similarly, "UnitedHealthcare provides a service called HealtheNotes to help educate members and make suggestions regarding medical care." (Dkt. 22-1, p. 73).

The 2016 SPD Section 6 uses the term "we" without clarifying who "we" refers to. (A.App. 131-133) ("We may credit against any previous intensive level services… We may also require documentation…We are not required to reimburse for travel time…We require that progress be assessed…We will cover services…").

With respect to the submission of claims, the SPD advises: "It is recommended that you confirm with UnitedHealthcare that all Covered Health Services listed below have been prior authorized as required" (A.App. 129) In the event a claim is denied, "UnitedHealthcare will conduct a full and fair review of your appeal" (A.App. 134); "Once the review is complete, if UnitedHealthcare upholds the denial, you will receive a written explanation of the reasons and facts relating to the denial" (A.App. 134). The beneficiary is advised that if there is dissatisfaction with the outcome of an appeal, suit may be brought

against "the School District of South Milwaukee or the claims administrator." (A.App. 142-143)

## II.     Disposition of the U.S. District Court, Western District of Wisconsin, the Honorable William M. Conley Presiding.

In its Opinion and Order, the District Court (A.App. 101-111), citing cases from the 7th Circuit involving benefits plans subject to ERISA, ruled that because there was no direct contractual relationship between the Daniels and United Healthcare the breach of contract claim must be dismissed. It further held that United Healthcare, as agent of a disclosed principal, could not be liable for a breach of the contract. The Court pointed to a statement in the SPD that the Plan "is solely responsible for paying benefits." Accordingly, "plaintiffs' breach of contract claim fails for lack of privity." (A.App. 108)

The District Court also dismissed the bad faith claim, holding that the lack of privity between the Daniels and United Healthcare precluded that claim. The Court ruled that, under Wisconsin law, the duty of good faith arises from the relationship between insurer and insured. It distinguished the *Aslakson* decision as being "based on a narrow set of facts involving the statutory and regulatory scheme surrounding the government-funded workers compensation program." (A.App. 110) It asserted that "in post-*Aslakson* cases" the Wisconsin Supreme Court "reaffirmed its 'refus[al] to recognize a bad faith claim when a claimant [i]s not in a contractual relationship with an insurance company," quoting from *Roehl Transp., Inc. v. Liberty Mut. Ins. Co*., 2010 WI 49, ¶ 42, 325 Wis.2d 56, 784 N.W.2d 542. (*Id.*)

Based on these holdings, the District Court also dismissed the Daniels' claims under Wis. Stats. § 628.46 and for punitive damages. (*Id.*)

## SUMMARY OF ARGUMENT

In ordering dismissal, the District Court accepted United Healthcare's contention that Wisconsin law does not permit the assertion of a breach of contract or bad faith claim against the administrator of an employee benefit plan because there is no direct contractual relationship with the employee-beneficiary and, by the terms of the Plan at issue, the duty to pay benefits rested with the employer-sponsor.

As demonstrated below, the Wisconsin Supreme Court has repeatedly extended the duty of good faith and fair dealing to agents of entities having a fiduciary duty to beneficiaries, whether that duty arises from contract or statute. Contrary to the holding of the District Court, it is not necessary that there be a direct contractual or insurance relationship between the beneficiary and the third-party administrator. Because the bad faith claim is valid under Wisconsin law, the punitive damage claim also survives.

The Daniels acknowledge that there was no direct contractual relationship with United Healthcare and, consequently, their breach of contract claim must be dismissed. However, under Wisconsin law, they will be entitled to recover the denied benefits as an element of the damages proximately resulting from United Healthcare's bad faith. In addition, Wisconsin courts have held the provisions of Wisconsin's "prompt payment of claims" statute, § 628.46, Wis. Stats., applicable to service insurance companies with no direct relationship to the claimant.

## STANDARD OF REVIEW

This Court reviews the district court's grant of a motion to dismiss *de novo*. *Augutis v. United States*, 732 F.3d749, 752 (7th Cir. 2013). In reviewing a motion to dismiss, this Court will rely on the allegations in the plaintiff's complaint without vouching for their truth. *Golden v. State Farm Mut. Auto Ins. Co.*, 745 F.3d 252, 255 (7th Cir. 2014). In its review, the Court must accept the allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff. *Michalowicz v. Vill. Of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008).

This Court's duty in a diversity case is to determine the issue of state law as it predicts the state supreme court would decide that issue. See *Doemer v. Callen*, 847 F.3d 522, 527 (7th Cir. 2017).

"When interpreting state law, a federal court's task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). If the state's supreme court has not yet addressed the issue, the federal court should "consult and follow the decisions of intermediate appellate courts" to predict how the supreme court would act given the chance, unless "there is convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). And absent "any authority from the relevant state courts, {the federal court} … shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

**ARGUMENT**

I. **WISCONSIN LAW EXTENDS THE DUTY OF GOOD FAITH AND FAIR DEALING TO AGENTS OF ENTITIES HAVING A FIDUCIARY RELATIONSHIP WITH BENEFICIARIES, WHETHER ARISING FROM CONTRACT OR STATUTE.**

The principal case relied on by the Daniels in opposition to United Healthcare's Motion to Dismiss was the Wisconsin Supreme Court's decision in *Aslakson v. Gallagher Bassett Services*, 2007 WI 39, 300 Wis.2d 92, 729 N.W.2d 712. The *Aslakson* court held that the third-party administrator of the Uninsured Employers Fund, which was obligated to pay workers compensation benefits to employees whose employers did not carry workers compensation insurance, could be liable for bad faith. The *Aslakson* court based its holding on its prior "seminal" decisions in *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978), and *Coleman v. American Universal Insurance Co.*, 86 Wis.2d 615, 273 N.W.2d 22 (1979). The District Court agreed with United Healthcare that *Aslakson* did not control this case because:

> [I]t is based on a narrow set of facts involving the statutory and regulatory scheme surrounding the government-funded worker's compensation program, and the Wisconsin Supreme Court in post-*Aslakson* cases reaffirmed its "refus[al] to recognize a bad faith claim when a claimant [i]s not in a contractual relationship with an insurance company." *Roehl Transp., Inc., v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶ 42, 325 Wis.2d 56, 784 N.W.2d 542.

(Dkt. 40, p. 10.)

Contrary to this holding, a review of the "evolution" of the tort of first party bad faith under Wisconsin law discloses that its application does not depend on the existence of a direct insurer-insured relationship. Rather, any party with responsibility for

19

determining eligibility for "insurance type" benefits is charged with the common law duty of good faith and fair dealing.

Beginning with *Anderson v. Continental Ins. Co*., 85 Wis.2d 675, 271 N.W.2d 368 (1978), and extending to *Aslakson v. Gallagher Bassett Services*, 2007 WI 39, 300 Wis.2d 92, 729 N.W2d 712, the Wisconsin Supreme Court has emphasized the fiduciary relationship between the parties which gives rise to the "implied covenant of good faith and fair dealing." *Anderson v. Continental Ins. Co*., 85 Wis.2d at 689, quoting *Gruenberg v. Aetna Insurance Co*., 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 521 P.2d 1032 (1973). This relationship may arise from statute, contract or, as here, an employer's benefit plan and Wisconsin has consistently held that duty of good faith and fair dealing extends to the agent of the party having the direct relationship with the beneficiary as set forth below.

### A. Wisconsin courts have long held that the agent of a party with the obligation to pay benefits has the same fiduciary duty of good faith and fair dealing toward the beneficiary.

In *Lueck v. Aetna Life Ins. Co*., 116 Wis.2d 199, 222 N.W.2d 628 (1984), the Wisconsin Supreme Court reviewed a trial court order, affirmed by the court of appeals, granting summary judgment in favor of Allis-Chalmers and Aetna, its third party administrator, dismissing the plaintiff's action. That action alleged that the defendants had acted in bad faith in responding to his claim for disability benefits under a group health plan which was part of a negotiated labor agreement. The primary issue on appeal was whether the action was preempted by the National Labor Relations Act. The Court held that it was not. *Id.* A secondary issue was whether the plaintiff could assert his bad faith

claim against Aetna, the third party administrator. The Supreme Court concluded that the court of appeals had erred in dismissing that claim:

> The final issue is whether the court of appeals erred in finding that Aetna had no liability for bad faith because, as an administrator of the insurance contract, it had no fiduciary duty to act in good faith. By virtue of the contract between A-C and Aetna, Aetna became A-C's agent for purposes of administering A-C's insurance contract with Lueck. As an agent specifically hired to administer the insurance contract, Aetna is not "a stranger to the [insurance] contract and to the fiduciary relationship it signifies." See *Kranzush v. Badger State Mutual Casualty Co*., 103 Wis. 2d 56, 73, 307 N.W.2d 256 (1981). As such, Aetna stands in the same relationship with Lueck as does A-C and, therefore, has the same fiduciary duty as the primary insurer. We hold that, even though the ultimate authority to approve or disapprove the payment of a claim rests with the primary insurer, the administrator still may be held liable if, in the administration of the claim, the administrator independently engages in conduct actionable under the tort of bad faith.

*Lueck v. Aetna Life Ins. Co*., 116 Wis.2d at 577, 342 N.W.2d at 727.

The Wisconsin Supreme Court's ruling on the preemption issue was subsequently reversed by the United States Supreme Court. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed. 206 (1985). Having held that the entire action was preempted, the U.S. Supreme Court's decision did not address the Wisconsin Supreme Court's holding that the bad faith claim could be asserted against Aetna, the third-party administrator.[1]

---

[1] The Wisconsin Supreme Court has referenced and cited to prior decisions that have likewise been reversed by the United States Supreme Court on grounds "not pertinent to" the issue in the case before it, noting that the reversed case accurately stated the controlling principle of Wisconsin substantive law. *In re Estate of Steffke*, 116 Wis.2d 199, 206, 222 N.W.2d 628, 631 (1974). *See, also*, *D.L. v. Huebner*, 110 Wis.2d 581, 641, n. 12, 329 N.W.2d 890, 918, holding that a statement in 1912 decision which had become "obsolete" for other reasons "remains good law." Consequently, the holding of the Supreme Court in *Lueck* on this issue retains its precedential authority. It certainly reflects "how the supreme court would rule" on this precise issue.

The holding in *Lueck* that the administrator, as the plan's agent, could be liable for its tortious conduct toward the beneficiary/employee is consistent with longstanding Wisconsin law. In *Ferris v. Location 3 Corp.,* 2011 WI App. 134, 804 N.W.2d 822, the Wisconsin Court of Appeals rejected a contention that two corporate officers could not be personally liable for misrepresenting the condition of property sold to the plaintiff. Appealing from a dismissal of his claims against the officers, the plaintiff cited to *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis.2d 683, 692, 273 N.W.2d 285 (1979):

> An individual is personally liable for his own tortious conduct. A corporate agent cannot shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporate entity; if he is shown to have been acting for the corporation, the corporation also may be liable, but the individual is not thereby relieved of his own responsibility.

*Ferris*, 2011 at ¶ 14. The *Ferris* court noted that this principle had been re-stated by the Wisconsin Supreme Court in *Hammer v. DILHR*, 92 Wis.2d 90, 97-98, 284 N.W.2d 587 (1979):

> The general rule is that the agent, as well as the principal for whom he is acting is responsible for the tortious acts of the agent. In such situation the corporate shield protects only those who would otherwise be vicariously liable, not those whose own conduct is called into question.

The *Ferris* court observed that same principle had been re-stated more recently in *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶¶ 41-42, 308 Wis.2d 103, 746 N.W.2d 762. Under the *Lueck* holding, United Healthcare, as the School District's agent, "has the same fiduciary duty" to the Daniels and may be liable directly to the Daniels for breach of that duty - even though the ultimate responsibility to pay benefits lay with the Plan.

### B. Wisconsin Courts have consistently extended the duty of good faith and fair dealing in "first party cases" beyond the traditional insurance relationship.

*Lueck* is not an aberration or outlier in holding that bad faith liability may be imposed outside the traditional insurer-insured relationship and on the agent of the party obligated to pay benefits. In *Poling v. Wisconsin Physicians Service*, 120 Wis.2d 603, 357 N.W.2d 293 (Wis. App. 1984), the Court of Appeals affirmed a judgment imposing damages for bad faith against Wisconsin Physicians Services, the administrator of the State of Wisconsin's employee group health insurance policies. Of note is that WPS did not assert on appeal that it could not be held accountable in bad faith because it had no direct "insurance" relationship with the plaintiff employee.

In *McEvoy Finn v. Group Health Cooperative of Eau Claire*, 213 Wis.2d 507, 570 N.W2d 397 (1997), the Wisconsin Supreme Court held that the tort of bad faith could be applied to health maintenance organizations. In that case, the plaintiffs were beneficiaries under a health maintenance plan issued by Group Health Cooperative to a government entity which employed the minor plaintiff's mother. GHC appealed from a decision by the court of appeals, contending that *"the tort of bad faith pertains only to insurance companies."* (emphasis added) In rejecting that contention, the Wisconsin Supreme Court reviewed the purpose and policy underlying the tort of "first party" bad faith:

> This court explicitly adopted the common law tort of bad faith as applied to first party claims under insurance contracts in *Anderson v. Continental Ins. Co*., 85 Wis.2d 675, 686, 271 N.W2d. 368 (1978); see also *Duir v. John Alden Life Ins. Co*. , 573 F.Supp. 1002 (W.D.Wis. 1983). Our adoption of this doctrine recognized that "bad faith conduct by one party to a contract toward another is a tort separate and apart from a breach of contract per se" and that separate damages may be recovered for this tort. *Anderson*, 85 Wis.2d at 686, 271 N.W.2d 368. The rationale underlying a bad faith cause

23

of action is to encourage fair treatment of the insured and to penalize unfair and corrupt insurance practices. By ensuring that the policyholder achieves the benefits of his or her bargain with the insurer, a bad faith cause of action helps to redress a bargaining power imbalance between parties to an insurance contract. See *Craft v. Economy Fire & Casualty Co.*, 572 F.2d 565, 569 (7th Cir. 1978)(applying bad faith tort remedy to remedy imbalance in bargaining power). *Grand Sheet Metal Prod. Co. v. Protection Mutual Ins. Co.*, 34 Conn.Supp. 46, 375 A.2d 428, 430 (1977)(applying bad faith tort to protect insured vulnerable at time of claim).

213 Wis.2d at 518, 570 N.W.2d at 403.

The Court then considered the "nature and purpose of HMOs." and concluded that the statutory, organization and operation of these entities "supports our general characterization of HMOs as insurers for bad faith purposes." 213 Wis.2d at 520, 570 N.W.2d at 403. The Court noted:

In the course of the contractual relationship between the HMO and subscriber, a power imbalance similar to that between a classical insurer and policyholder exists. An HMO subscriber has little effective bargaining power since policy terms, like those in insurance contracts, are usually prepackaged and subject to a significant number of regulations and rules. When faced with a problem, HMO subscribers, like many insurance policyholders, may encounter bureaucratic or procedural hurdles in asserting their contractual health care rights. As a practical matter, HMO subscribers are similarly situated vis-à-vis their HMOs as insurance policyholders are to their more traditional insurance companies.

*Id.*

In *Coleman v. American Universal Ins. Co.*, 86 Wis.2d 615, 273 N.W.2d (1979), the Wisconsin Supreme Court held that the insurer for an employer could be liable to an employee for bad faith in processing his claim for statutory workers compensation benefits, even though there was no direct insurer-insured relationship between the employee and the insurer. *Coleman*, in turn, served as precedent for the Court's later holding in *Aslakson*

which extended the duty of good faith and fair dealing to the administrator of the Uninsured

Employer's Fund. It is clear from the Wisconsin Court's analysis of the "evolution" of bad

faith law in *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶ 42, 325 Wis.2d 56,

that the fundamental basis for a bad faith claim is not the existence of a formal "insurance"

relationship between the claimant and the defendant, but the *fiduciary nature* of that

relationship, whether based on contract or statutory scheme.

In *Roehl*, the issue was whether a liability insurer could be held liable in bad faith

for exposing its insured to an obligation to pay its deductible even though there was no

"excess" judgment. In affirming a jury verdict in favor of the insured, the court emphasized

that there can be no hard and fast restrictions on the scope of the duty of good faith and fair

dealing and the circumstances in which it might arise:

> No Wisconsin case holds that the three types of bad faith claims previously recognized are the only situations in which a claim of insurance bad faith may be recognized. Nor do Wisconsin cases purport to catalogue all possible bad faith claims. We cannot unearth any hint in the case law that the tort of bad faith is confined to the three fact patterns described in the existing case law. Rather, the three identified types of insurance bad faith claims arise from fact situations presented to the courts to date.
>
> A review of the history of the tort reveals an evolution of the tort of bad faith over the decades. The case law first recognized a bad faith claim in third party claims with judgments exceeding policy limits, while later cases recognized the validity of the claim in two novel situations: first-party claims and workers' compensation claims. The common-law history of insurance bad faith claims in this state requires the court to analyze the facts of the claim presented and determine whether the established principles of the tort of bad faith support recognizing the claim presented as raising a valid cause of action.

2010 WI at ¶¶ 36, 37. Citing the seminal "first party" case of *Anderson v. Continental Ins.*

*Co.*, 85 Wis.2d 675, 683, 271 N.W.2d 368 (1978), the *Roehl* court emphasized that the duty

of good faith is a "special duty" arising from a "fiduciary relationship" between the parties. 2010 WI at ¶ 83.

Consistent with these principles, it is no surprise that the Wisconsin court has extended the scope of the duty beyond the traditional insurer-insured relationship and to third parties which have assumed responsibility for administering benefits arising from that relationship. In *Coleman* it was the insurance company for the employer which had contracted to pay the benefits; in *Aslakson* it was the third-party administrator which had contracted to determine eligibility for benefits from the Uninsured Employers Fund; in *McEvoy* and *Poling* it was the administrator of an employer's benefit plan. It is further significant that in all these cases the ultimate obligation to pay benefits determined by the third-party administrator remained that of the sponsoring entity.

In its nonparty brief in *Aslakson*, the Department of Workforce Development argued that it was contrary to public policy to impose liability on the third-party administrator because it would "not accomplish the public policy of tort law to deter the wrongdoer from engaging in further misconduct, because any damages the Department's agent pays for its wrongdoing will eventually be passed on to the Uninsured Employers Fund." *Aslakson*, 2007 WI 39 at ¶ 84. The Court disagreed, stating:

> The Department's view of public policy is not the only view of public policy. It is also arguable that imposing tort liability on the Department's agent for bad faith supports public policy and the deterrent goal of tort law. It is contrary to the purposes of the Uninsured Employers Fund and the Worker's Compensation Act to hold that the Fund's administrator (an agent of the Department) has no duty to act in good faith to injured employees when administering claims. It is also contrary to public policy to deny an injured employee relief against the Department's agent for a separate and distinct injury allegedly caused by its intentional tort of bad faith.

*Aslakson*, 2007 WI 39 at ¶ 85.

United Healthcare does not contend that the Plan did not have a fiduciary obligation to the Daniels of the type which would give rise to the duty of good faith and fair dealing under Wisconsin law. Nor can it contend that it did not play a central role in fulfilling the School District's fiduciary obligation in the determination of benefits owing under the Plan. That United Healthcare was intimately and extensively involved in the determination of claims by beneficiaries of the School District of South Milwaukee's Plan is beyond dispute as set forth in the Plan Document. Indeed, United Healthcare was expressly delegated the "discretion and authority to decide" all applications for benefits.

Under the authority of *Lueck*, *Poling*, *McEvoy* and *Aslakson*, the fact that the ultimate obligation to pay benefits determined to be owing lay with the principal obligor does not insulate United Healthcare from bad faith liability for its conduct in making this determination.

### C. Contrary to the District Court's ruling, *Roehl* does not support the proposition that direct "insurance" relationship is necessary to the duty of good faith and fair dealing in the first party context.

It is significant that the Court in *Lueck* referenced its *Kranzush* decision. United Healthcare and the District Court quoted from *Roehl Transp. Inc. v. Liberty Mut. Ins. Co.*, 2010 41 49, ¶ 42, 325 Wis.2d 56, 784 N.W.2d 542 for the proposition that Wisconsin has "refused to recognize a bad faith claim when a claimant [i]s not in a contractual relationship with an insurance company." The *Roehl* court, in turn, cited *Kranzush* for this proposition. The citation to *Kranzush* by the *Lueck* court, as well as the holdings in *McEvoy*, *Coleman*

and *Aslakson* and the analysis of the foundation of the duty of good faith in *Roehl* demonstrate that UHC and the District Court over-stated the significance of the quoted statement.

Both *Kranzush* and *Roehl* involved *third party* bad faith claims. In *Kranzush* the Wisconsin Supreme Court held that a tort victim could not assert a bad faith claim against the tortfeasor's liability insurer, pointing to the inherent "adversarial relationship" which exists between those parties. *Kranzush* 103 Wis.2d at 73, 307 N.W.2d at 265. As in *Lueck*, United Healthcare is not a "stranger to the (School District of South Milwaukee's Plan) and to the fiduciary relationship it signifies." There is not (and should not be) the adversarial relationship which was at the heart of the Court's decision in *Kranzush*.

## II.     REVERSAL OF THE ORDER DISMISSING THE DANIELS' BAD FAITH CLAIM WILL DISPOSE OF THE MOTION WITH RESPECT TO THE PUNITVE DAMAGE CLAIM.

United Healthcare argued, and the District Court agreed, that dismissal of the Daniels' bad faith claim necessarily required dismissal of the punitive damages claim. Because the District Court's order dismissing the bad faith claim must be reversed, the punitive damages necessarily also must survive.

## III.     DISMISSAL OF THE BREACH OF CONTRACT CLAIM WILL NOT PRECLUDE THE DANIELS FROM RECOVERING DENIED BENEFITS AS AN ELEMENT OF DAMAGE IN THEIR BAD FAITH CLAIM.

The Daniels concede that they do not have the direct contractual relationship with United Healthcare which would, under Wisconsin law, permit the assertion of a traditional breach of contract claim. As acknowledged by the District Court, its discussion of the cases

arising from "breach of contract" claims made against administrators of plans subject to ERISA is academic, as the School District of South Milwaukee's Plan is not subject to ERISA.

As noted by the District Court, the Daniels have elected not to assert their claims directly against the School District of South Milwaukee as sponsor of the Plan. This does not mean, however, that they will not be permitted to recover the value of the denied benefits, as well as all other damages proximately resulting from United Healthcare's alleged bad faith. In *Jones v. Secura Insurance Company*, 2002 WI 11, 249 Wis.2d 623, 638 N.W2d 575, the Wisconsin Supreme Court held that an insured was not barred from recovering fire insurance contract benefits as an element of damages in the bad faith action even though the statute of limitations had expired on the breach of contract claim. Such damages are considered to have proximately resulted from the bad faith conduct. The full extent of potential damages arising from United Healthcare's alleged bad faith conduct are not before the Court on this appeal.

## IV.    DISMISSAL OF THE BREACH OF CONTRACT CLAIM DOES NOT REQUIRE DISMISSAL OF THE CLAIM FOR WIS. STATS. § 628.46 INTEREST.

Dismissal of the breach of contract claim will not require dismissal of the Daniels' claim based on Wis. Stats. § 628.46 for interest on benefits ultimately found to have been wrongly denied. Although the statute refers to "insurers," the Wisconsin Supreme Court has held it applicable to "service insurance corporations." *Wisconsin Physicians Service Ins. Corp. v. Mitchell*, 114 Wis.2d 338, 338 N.W.2d 326 (Ct. App. 1983). In *Kontowicz v. American Standard Ins. Co.*, 2006 WI 48, 290 Wis.2d 302, 714 N.W.2d 105, the Wisconsin

Supreme Court held the statute applicable even where there was no direct insurer-insured relationship.

## **CONCLUSION**

For the reasons stated, it is respectfully submitted that the Order and Judgment of the District Court dismissing the Daniels' bad faith claim against United Healthcare must be reversed. While the dismissal of the breach of contract claim may be affirmed, the Daniels retain the right to assert the value of denied benefits, and all other economic losses incurred, as elements of their bad faith damage claim. The dismissal of the Wis. Stats. § 628.46 interest claim should also be reversed.

Dated this 27th day of October, 2022.

GINGRAS, THOMSEN & WACHS

Electronically Signed By /s/ Robert J. Gingras
Robert J. Gingras
WI State Bar No. 1002909
Lynn R. Laufenberg
WI State Bar No. 1016236
8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
gingras@gtwlawyers.com
laufenberg@gtwlawyers.com
Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

X this document contains 6,803 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

X this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 13.

Dated this 27th day of October, 2022.

GINGRAS, THOMSEN & WACHS

Electronically Signed By /s/ Robert J. Gingras
Robert J. Gingras
WI State Bar No. 1002909
Lynn R. Laufenberg
WI State Bar No. 1016236
8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
gingras@gtwlawyers.com
laufenberg@gtwlawyers.com
Attorneys for Plaintiffs-Appellants

## STATEMENT ON REQUIRED MATERIALS
## IN COMPLIANCE WITH CIRCUIT RULE 30(d)

I hereby certify that all materials required by Circuit Rule 30(a) and (b) are included

in this Appendix.

Dated this 27th day of October, 2022.

GINGRAS, THOMSEN & WACHS

Electronically Signed By /s/ Robert J. Gingras
Robert J. Gingras
WI State Bar No. 1002909
Lynn R. Laufenberg
WI State Bar No. 1016236
8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
gingras@gtwlawyers.com
laufenberg@gtwlawyers.com
Attorneys for Plaintiffs-Appellants

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Case No. 22-2210

---

MEGAN DANIELS,
CHRIS DANIELS and
BETSY DANIELS,

      Plaintiffs-Appellants,

v.

UNITED HEALTHCARE SERVICES, INC. and
UNITED BEHAVIORAL HEALTH,

      Defendants-Appellees.

---

**On Appeal from U.S. District Court (W.D.-Wis.) Case No. 3:19-cv-1038
The Honorable William M. Conley Presiding**

---

**STIPULATED JOINT APPENDIX OF PLAINTIFFS-APPELLANTS
MEGAN DANIELS, CHRIS DANIELS AND BETSY DANIELS**

---

GINGRAS, THOMSEN & WACHS
Robert J. Gingras
WI State Bar No. 1002909
Lynn R. Laufenberg
WI State Bar No. 1016236
8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
gingras@gtwlawyers.com
laufenberg@gtwlawyers.com
Attorneys for Plaintiffs-Appellants

## <u>TABLE OF CONTENTS OF APPENDIX</u>

| Document | App. Page No. | Record No. |
|---|---|---|
| Opinion and Order dated June 13, 2022 | A.App. 101-111 | 40; 44-2 |
| Judgment in a Civil Case dated June 14, 2022 | A.App. 112 | 41; 44-3 |
| Amended Complaint dated February 6, 2020 | A.App. 113-126 | 12 |
| Excerpts from Summary Plan Document: | | 22-1 |
| A.  Appellant's SPD Excerpts | A.App. 127-134 | |
| B.  Appellee's SPD Excerpts | A.App. 135-147 | |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MEGAN DANIELS, BETSY DANIELS
and CHRIS DANIELS,

                        Plaintiffs,                    OPINION AND ORDER

        v.                                             19-cv-1038-wmc

UNITED HEALTHCARE SERVICES, INC.
and UNITED BEHAVIORAL HEALTH,

                        Defendants.

Plaintiffs Megan Daniels and her parents, Betsy and Chris Daniels, assert breach of
contract, bad faith and statutory, "prompt pay" claims against their insurance plan claims
administrators, based on their denial of coverage for inpatient mental health treatment.
Before the court is defendants United HealthCare Services, Inc., and United Behavioral
Health's motion to dismiss the amended complaint.  (Dkt. #20.)  For the reasons that
follow, the court will grant that motion, concluding that plaintiffs' have not pleaded
sufficient facts to overcome defendants' status as third-party administrators and not the
insurer, precluding plaintiffs' claims as a matter of law.

ALLEGATIONS OF FACT[1]

Betsy and Chris Daniels are employees of the South Milwaukee School District and

---

[1] At the time of removal of this lawsuit from the Dane County Circuit Court, the court had diversity
jurisdiction over the merits under 28 U.S.C. § 1332(a) as:  plaintiffs are citizens of Wisconsin;
defendant United Healthcare Services, Inc., is a citizen of Minnesota; and the amount in
controversy exceeds $75,000.  (Not. of Removal (dkt. #1) ¶¶ 5-6, 11-13.)  However, plaintiffs'
amended complaint purports to add United Behavioral Health as a defendant, without alleging its
citizenship.  Given that plaintiffs do allege that United Behavioral Health is a subsidiary of United

receive health insurance coverage through the District's Choice Plus Plan 1 (the "Plan"). (Am. Compl. (dkt. #12) ¶¶ 12-13.)  Defendant United Behavioral Health ("UBH") is a subsidiary of defendant United HealthCare Insurance Company ("UHC"), who for convenience will be referred to collectively as "United."  Plaintiffs allege that "Defendants UHC and/or UBH carry decision-making authority in awarding benefits under the Plan." (*Id.* ¶ 14.)

In February 2017, Megan Daniels was treated for mental health issues at an inpatient treatment center.  Originally, United approved Megan's insurance coverage for the cost of seventeen days of inpatient treatment, then extended that coverage for an additional seven days.  At the end of that period, however, United informed the Daniels that Megan was no longer considered "at imminent risk of harm to self or others" under the Plan's terms and, therefore, was no longer approved for inpatient coverage.  (Am. Compl. (dkt. #12) ¶ 27.)  In contrast, Megan's health care providers indicated that she needed to continue with the program for her own safety, so the Daniels continued her inpatient care at approximately $1,000 per day.

At the same time, the Daniels also pursued a set of appeals from the denial of continued coverage, which United explained was based on the "UBH Level of Care Guideline."  (*Id.* ¶ 33.)  Plaintiffs claimed that this Guideline "was itself in violation of the generally accepted standards of care, thereby improperly tainting Plaintiffs' coverage decision, in violation of the terms of the Plan."  (*Id.* ¶ 36.)  As for defendants' role in the

---

Healthcare Services, Inc., the court will assume that it is a citizen of Minnesota as well.  To the extent the court's assumption is incorrect, all parties are directed to inform the court promptly.

denial of coverage on appeal, plaintiffs point out in their amended complaint that UBH's insignia is on the top of each rejection letter, and that the bottom of those letters state, "Insurance coverage is provided by United Healthcare Services, Inc."  (*Id.* ¶¶ 37-38.)

In response, defendants attach to their original and renewed motions to dismiss the 2016 Summary Plan Description ("SPD"), which explains that the Plan is self-funded and the Plan's sponsor, "South Milwaukee School District," is "solely responsible for paying Benefits" under the Plan, as well as is "solely responsible for . . . the timely payment of Benefits."  (Nguyen Decl., Ex. 1 (dkt. ##11-1, 22-1) at 1, 4, 110.)  Moreover, South Milwaukee School District is also designated as the "Plan Administrator."  (*Id.* at 123.)  As a result, United serves as the Plan's third-party, "claims administrator," helping South Milwaukee School District "to administrate claims" for healthcare coverage.  (*Id.* at 1.)  However, the SPD expressly states that "United Healthcare . . . does not guarantee any Benefits."  (*Id.* at 1.)

Nevertheless, plaintiffs assert claims against both defendants for breach of contract, bad faith, and a failure to timely pay as required under Wisconsin Statute § 628.46.[2] Plaintiffs seek benefits due "under the Plan" and punitive damages.  (Am. Compl. (dkt. #12) ¶¶ 61, 71, 82, 92.)

---

[2] Plaintiffs also seek punitive damages, but this is not a separate cause of action under Wisconsin law, rather it is a form of relief.  *See Est. of Bain v. TransAmerica Life Ins. Co.*, No. 18-C-311, 2018 WL 3328005, at *4 (E.D. Wis. July 6, 2018) (explaining that under Wisconsin law, a freestanding punitive damages claim should be dismissed as a separate cause of action ) (citing Wisconsin state court cases).  In light of the court's decision dismissing all of plaintiffs' causes of action, therefore, no separate basis for an award of punitive damages exists.

OPINION

## I. Motion to Strike

Six weeks after defendants filed their reply in support of their motion to dismiss the amended complaint, plaintiffs filed a "notice of supplemental authority," seeking to direct the court to highlighted language from the SPD that defendants submitted with their motion to dismiss.  (Not. of Suppl. Authority (dkt. #25); Nguyen Decl., Ex. 1 (dkt. #22-1).)  That language emphasizes that Plan's statute of limitations for bringing a legal action applies not just to the District, but to the "Claims Administrator."   In context, that language reads:

> You cannot bring any legal action against School District of South Milwaukee **or the Claims Administrator** to recover reimbursement until 90 days after you have properly submitted a request for reimbursement as described in this section and all required reviews of your claim have been completed. If you want to bring a legal action against School District of South Milwaukee or the Claims Administrator, you must do so within three years from the expiration of the time period in which a request for reimbursement must be submitted or you lose any rights to bring such an action against School District of South Milwaukee or the Claims Administrator.

> You cannot bring any legal action against School District of South Milwaukee **or the Claims Administrator** for any other reason unless you first complete all the steps in the appeal process described in this section. After completing that process, if you want to bring a legal action against School District of South Milwaukee or the Claims Administrator you must do so within three years of the date you are notified of the final decision on your appeal or you lose any rights to bring such an action against School District of South Milwaukee or the Claims Administrator.

(Pls.' Not. of Suppl. Authority (dkt. #25) 2 (quoting Nguyen Decl., Ex. 1 (dkt. #22-1) 99-

4

100) (emphasis in plaintiffs' submission).)  In reliance on this language, plaintiffs now argue that the SPD "specifically acknowledges Plaintiffs' right to bring an action against the Defendants for failing to satisfy the plan's contractual commitments."  (*Id.* at 1.)

In response, defendants move to strike this notice and argument all together, because it is not a "notice of supplemental authority," but rather an untimely, unauthorized sur-reply.  (Dkt. #29.)  Keeping in mind that this court has *no* local rule about such submissions -- consistent with a general practice of relying on the Federal Rules of Civil Procedure and common sense, rather than a litany of additional rules addressing the minutia of practice -- the court agrees that plaintiffs' late submission was *not* a notice of supplemental authority.  Within its ordinary plain meaning, "supplemental authority" is typically new legal authority, of arguable dispositive or at least persuasive value, issued after briefing is completed but before the court rules on a pending matter.  Even interpreting supplemental "authority" more broadly, it is certainly not language in a document that was attached to an original motion.  Accordingly, plaintiffs should have either brought this language to the court's attention in their original opposition to the motion to dismiss or acknowledged their failure to do so and sought leave to file a sur-reply.  What plaintiffs should not have done is try to make a new argument without acknowledging that is what is occurring.

As such, the court is inclined to grant defendants' motion to strike.  Still, if the court grants the motion and does not consider this language in the SPD, plaintiffs would likely either move to file a second amended complaint or a motion for reconsideration seeking leave to submit this same argument.  Since this case has already been pending for some

time, therefore, the court opts to address the language in the SPD in this opinion and order, especially since the language does not open a new door for plaintiffs' breach of contact claim to proceed.  For these reasons, the motion to strike is denied, and the court discusses the significance of this additional language below.

## II. Motion to Dismiss

Defendants seek dismissal of plaintiffs' claims for three, related reasons: (1) plaintiffs' breach of contract claims fail is with the Plan itself, not the claims administrator; (2) bad faith claims under Wisconsin law are generally directed against one's insurance company, while defendants are not plaintiffs' insurer; and (3) similarly, statutory "prompt pay" claims only apply to an insurers' failure to pay.  The court addresses each argument in turn below.

### A. Breach of Contract Claims

To begin, defendants seek dismissal of plaintiffs' breach of contract claims on the basis that the only contract at issue is for health insurance coverage with the Plan, not defendants as third-party claims administrators.  In *Larson v. United Healthcare Insurance Company*, 723 F.3d 905 (7th Cir. 2013), the Seventh Circuit explained that "benefits are an obligation of the plan, so the plan is the logical and normally the only proper defendant in a claim for benefits."  *Id.* at 911; *see also Brooks v. Pactiv Corp.*, 729 F.3d 758, 764 (7th Cir. 2013) (affirming district court's ruling that the plan was the "right defendant on the benefits plan"); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610-11 (7th Cir. 2007) (affirming dismissal of claim for benefits against third-party administrator where the plan documents

6

A.App. 106

distinguished between the plan and the third-party administrator).   The court acknowledges that most of the cases cited by defendants concern claims under the Employee Retirement Income Security Act, 29 U.S.C. § 1332(a)(1)(B) -- largely because most of the cases concerning denial of coverage implicate the preemption provision of ERISA[3] -- but the court sees no reason (and plaintiffs fail to offer any basis) for distinguishing the key holding in these cases to the common law breach of contract claim at issue here.   Indeed, the Seventh Circuit has analogized a denial of benefits claim under ERISA to a breach of contract claim.   *See Brooks*, 729 F.3d 764 (explaining the plan is the proper defendant for a right to benefits claim under an ERISA § 502(a)(1)(B) claim because it is "essentially a contract remedy under the terms of the plan" (quoting *Larson*, 723 F.3d at 911–12 (quotation marks omitted))).

In response, plaintiffs largely ignore this overwhelming caselaw and common sense, contending instead that the court should accept their allegation that defendants were contractually obligated to pay benefits and should *not* consider any language in the SPD. Aside from the obvious -- that the court has to consider the Plan's insurance language to determine any coverage obligations -- plaintiffs' argument rests on a mistaken understanding of what documents the court can consider in deciding a motion to dismiss. While plaintiffs are correct that the court may consider documents that are attached to the complaint under Federal Rule of Civil Procedure 10, the court may also consider documents attached to the motion to dismiss as long as they are "concededly authentic"

---

[3] As defendants explain in response to this court's order requesting supplemental briefing, the plan at issue here is not governed by ERISA because it was created by a governmental entity, the District, and is thereby expressly excluded.   29 U.S.C. § 1003(b)(1).

and "central to the plaintiffs' claim." *Hecker v. Deer & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009).  Indeed, the Seventh Circuit endorsed just such a review of SPDs in *Hecker*, and this court routinely reviews SPDs in denial of coverage cases at the motion to dismiss stage. *E.g.*, *Univ. of Wis. Hosps. & Clinics Auth. v. Aetna Health & Life Ins. Co.*, 144 F. Supp. 3d 1048, 1050 n.3 (W.D. Wis. 2015); *Kolbe & Kolbe Health & Welfare Ben. Plan v. Med. Coll. of Wis., Inc.*, No. 09-CV-205-BBC, 2009 WL 3245108, at *1 (W.D. Wis. Oct. 6, 2009).

Moreover, by filing their misnamed "notice of supplemental authority," plaintiffs have effectively acknowledged the central importance of the document attached to defendants' motion and expressly asked the court to consider the SPD's language as a basis for its claim against defendants as "the Claims Administrator."  While the cited language in the notice mentions a possible lawsuit against the claims administrator, this language primarily concerns the statute of limitations for bringing a lawsuit.  That language does not *create* a breach of contract claim by itself, including a breach of a duty of the good faith and fair dealing, which under Wisconsin law sounds only in contract.

Finally, to the extent that plaintiffs are relying on defendants' status as agents of the Plan, Wisconsin law holds that "where an agent acts on behalf of a disclosed principal, the agent does *not* become personally liable to the other contracting party."  *Williams v. Travelers Home & Marine Ins. Co.*, 402 F. Supp. 3d 499, 504-05 (E.D. Wis. 2019) (emphasis added) (describing a "longstanding general rule" under Wisconsin law) (citing *Benjamin Plumbing, Inc. v. Barnes*, 162 Wis. 2d 837, 470 N.W.2d 888, 893 (Wis. 1991)).  For unknown reasons, plaintiffs' experienced counsel declined to name the Plan itself as a

defendant, not just in their original complaint, but again in their amended complaint, which was filed *after* defendants pointed out this defect in their original motion to dismiss.

Perhaps, a breach of fiduciary duty akin to a claim under ERISA, 29 U.S.C. § 1132(a)(1)(B), could be asserted, but plaintiffs also did not plead that claim in their original *or* in their amended complaint.  Regardless, the language in the SPD states that: (1) the Plan is "solely responsible for paying Benefits"; and (2) the claims administrator's role is limited to helping the Plan Administrator, which is also named as the South Milwaukee School District.  (Nguyen Decl., Ex. 1 (dkt. #22-1).)  Accordingly, plaintiffs' breach of contract claim fails for lack of privity.

## B.  Bad Faith Claims

Similarly, defendants seek summary judgment on plaintiffs' bad faith claim based on a lack of contractual privity between plaintiffs and defendants, directing the court to a slew of Wisconsin cases holding that a bad faith claim is necessarily premised on such a relationship.  *Danner v. Auto-Owners Inc.*, 2001 WI 90, ¶ 49, 245 Wis. 2d 49, 629 N.W.2d 159 (explaining that special relationship between insurer and insured provides basis for tort remedy if insurer breaches that relationship); *Brethorst v. Alliance Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 35, 334 Wis. 2d 23, 798 N.W.2d 467 ("a bad faith claim arises from the contractual relationship between the parties").  For this reason, our sister court has concluded that a third-party claims administrator "is not liable . . . for bad faith damages" under Wisconsin law, finding that such an administrator is "not a party to the contract and has no contractual duty to" the members.  *See, e.g.*, *Diversatek, Inc. v. QBE Ins. Corp.*, No. 07-C-1036, 2010 WL 4941733, at *12 (E.D. Wis. Nov. 30, 2010).

9

A.App. 109

In response, plaintiffs direct the court to *Aslaskon v. Gallagher Bassett Services*, 2007 WI 39, 300 Wis. 2d 92, 729 N.W.2d 712, for the proposition that the "Wisconsin Supreme Court has permitted bad faith claims to arise in circumstances, such as this one, where the defendant(s) administered a benefits program and were not in contractual privity with the plaintiff(s)." (Pls.' Opp'n (dkt. #23) 8.) As defendants explain in response, however, *Aslaskon* is based on a narrow set of facts involving the statutory and regulatory scheme surrounding the government-funded worker's compensation program, and the Wisconsin Supreme Court in post-*Aslaskon* cases reaffirmed its "refus[al] to recognize a bad faith claim when a claimant [i]s not in a contractual relationship with an insurance company." *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶ 42, 325 Wis. 2d 56, 784 N.W.2d 542. Accordingly, the court concludes that the lack of the privity between plaintiffs and defendants also dooms any bad faith claims under Wisconsin law.

### C. "Prompt Pay" Statutory Claim

Finally, defendants contend that plaintiffs' claim under Wisconsin Statute § 682.46 fails because the plain language of the statute is limited to insurers. Specifically, the statute provides that "an insurer shall promptly pay every insurance claim." Wis. Stat. § 682.46(1). In response, plaintiffs rely on the same argument offered to support their breach of contract claims -- namely, that plaintiffs have claimed a contractual relationship, primarily relying on their allegation that defendants identify themselves as the insurer in communications addressed to plaintiffs. However, this argument again ignores language in the SPD explaining that: (1) the Plan is solely responsible for paying benefits; and (2)

10

defendants' role is limited to assisting the Plan Administrator in deciding claims.  Thus,

the court concludes that this claim must fail as a matter of law as well.[4]

## ORDER

IT IS ORDERED that:

1) Defendants United HealthCare Services, Inc., and United Behavioral Health's motion to dismiss the amended complaint (dkt. #20) is GRANTED.

2) The clerk's office is directed to enter judgment in defendants' favor and close this case.

Entered this 13th day of June, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[4] Because plaintiffs have already had the opportunity to respond to the same arguments raised in defendants' motion to dismiss their original complaint and to file an amended pleading, the court will dismiss this case without providing plaintiffs with the opportunity for further amendment.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MEGAN DANIELS, BETSY DANIELS,
and CHRIS DANIELS,

     Plaintiffs,                            Case No.  19-cv-1038-wmc

   v.

UNITED HEALTHCARE SERVICES, INC.
and UNITED BEHAVIORAL HEALTH,

     Defendants.

---

JUDGMENT IN A CIVIL CASE

---

      IT IS ORDERED AND ADJUDGED that judgment is entered in favor of

defendants United Healthcare Services, Inc. and United Behavioral Health against

plaintiffs Megan Daniels, Betsy Daniels, and Chris Daniels dismissing this case.


_____s/ K. Frederickson, Deputy Clerk_____     _____June 14, 2022_____
Joel Turner, Clerk of Court                           Date

### IN THE UNITED STATES COURT
### FOR THE WESTERN DISTRICT OF WISCONSIN

**MEGAN DANIELS**
**15145 Kings Ridge Court**
**Brookfield, WI 53005**

**BETSY DANIELS**
**15145 Kings Ridge Court**
**Brookfield, WI 53005**

**CHRIS DANIELS**
**15145 Kings Ridge Court**
**Brookfield, WI 53005,**

             Plaintiffs,                     Case No.: 3:19-cv-1038-wmc
                                           Civil Code: 30303
v.                                            CONTRACT

**UNITED HEALTHCARE SERVICES, INC.**
**c/o CT Corporation System**
**301 South Bedford Street, Suite 1**
**Madison, WI 53703,**

**UNITED BEHAVIORAL HEALTH**
**c/o CT Corporation System**
**301 S. Bedford St. Suite 1**
**Madison, WI 53703**

             Defendants.

---

### AMENDED COMPLAINT

---

     NOW COME the Plaintiffs, Megan, Betsy and Chris Daniels, by their attorneys, Gingras,

Thomsen & Wachs, by Robert J. Gingras and Scott B. Thompson, and hereby alleges and shows

the following to the court:

## PARTIES

1.      At all times relevant hereto, Plaintiff Megan Daniels ("Megan") has been a minor resident of the State of Wisconsin, residing at 15145 Kings Ridge Court Elmer Road, Brookfield, WI 53005. Megan is the daughter of Chris and Betsy Daniels.

2.      At all times relevant hereto, Plaintiff Betsy Daniels ("Betsy") has been a resident of the State of Wisconsin, residing at 15145 Kings Ridge Court Elmer Road, Brookfield, WI 53005. Betsy is Megan's mother, and wife to Chris.

3.      At all times relevant hereto, Plaintiff Chris Daniels ("Chris") has been a resident of the State of Wisconsin, residing at 15145 Kings Ridge Court Elmer Road, Brookfield, WI 53005. Chris is Megan's father, and husband to Betsy.

4.      Defendant United HealthCare Services, Inc., dba/aka United HealthCare Insurance Company ("UHC"), is an insurance company operating within the State of Wisconsin. UHC provided a policy of insurance to Plaintiffs, which was in full force and effect at all relevant times hereto. On information and belief, UHC is a subsidiary of UnitedHealth Group Inc. The registered agent for service of process for UHC is CT Corporation System, 301 S Bedford Ste 1, Madison, WI 53703.

5.      Defendant United Behavioral Health ("UBH") is foreign entity with a principal office in San Francisco, CA doing business within the State of Wisconsin. On information and belief, Defendant UBH is a subsidiary of Defendant UHC. The registered agent for service of process for United Behavioral Health is CT Corporation System, 301 S. Bedford Ste 1, Madison WI 53703.

## FACTUAL ALLEGATIONS

6.      UHC is a massive health care insurance company which, according to its website, serves "millions of people from their earliest years through their working lives and into

retirement."

7.    On its website UHC represents to Wisconsinites and the greater American public that its mission is to "help people live healthier lives and make the health system work better for everyone." Available at https://www.uhc.com/about-us.

8.    Throughout 2019, UHC and its subsidiary, UBH, came under fire for their practices in unfairly and/or arbitrarily denying benefits for mental health treatment to qualified individuals across the country.

9.    UHC and/or UBH's practices made national headlines earlier this year when a federal judge in Northern California determined that they "created internal polices aimed at effectively discriminating against patients with mental health and substance abuse disorders to save money." Abelson, Reed, *Mental Health Treatment Denied to Customers by Giant Insurer's Policies, Judge Rules*, THE NEW YORK TIMES, March 5, 2019, available at https://www.nytimes.com/2019/03/05/health/unitedhealth-mental-health-parity.html; see also *Wit v. United Behavioral Health*, No. 3:13-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019).

10.   According to The New York Times, UBH was found "to have let 'financial incentives' infect" its practices.

11.   Sadly, it seems, Wisconsin families are no stranger to these ignominious practices.

12.   Plaintiffs Betsy and Chris are employees of South Milwaukee School District; Betsy is the Library Media Specialist at the high school, while Chris is the Work-Based Learning Coordinator for the district.

13.   At all times relevant hereto, the Daniels family received health insurance coverage under Betsy and Chris' contract for health insurance, titled UHC's School District of South Milwaukee Choice Plus Plan 1 ("the Plan").

14.     On information and belief, Defendants UHC and/or UBH carry decision-making authority in awarding benefits under the Plan.

15.     In February of 2017, the Daniels family encountered a family health crisis.

16.     Megan was suffering from severe mental illness at the time.

17.     Megan had a history of dangerous mental health issues—she had already attempted suicide on three occasions.

18.     At that time, February of 2017, Megan's boyfriend overdosed on prescription drugs used to treat his mental health condition.

19.     As a result of this significant trauma, Megan began succumbing once again to insomnia, panic attacks, crippling anxiety, and severe depression with suicidal ideation.

20.     Quite obviously, Megan was not healthy.

21.     Chris and Betsy did everything they could for their ill daughter.

22.     The pair began researching care programs and other facilities in the area that could provide Megan the health care she desperately needed.

23.     To their fortune, they discovered an apt treatment center near to their home – the Nashotah Program and Rogers Memorials Hospital ("Nashotah").

24.     The admission process for this program is lengthy–in the interim, the Daniels family stayed home with Megan at all times, even flying the family grandmother from Arizona to Wisconsin simply to keep tabs on Megan through her mental health crisis.

25.     Eventually, Megan was admitted to the program.

26.     Originally, UHC and/or UBH approved Megan for coverage of inpatient care at Nashotah for seventeen days of covered treatment. This approval was then extended by an additional seven days.

27.     At the end of this time period, UHC and/or UBH sent correspondence to the Daniels

family informing them that Megan was not "at imminent risk of harm to self or others" and therefore was no longer approved for coverage under the Plan.

28.    Megan's health care providers told the family the exact opposite. They indicated that Megan was not safe to leave the program.

29.    The care at Nashotah costs approximately $1,000 each day. Regardless of the UHC/UBH determination, the family did what it had to do – it continued with treatment regardless of the mounting bills to save their daughter's life.

30.    Simultaneously, the family elected to pursue a set of appeals with UHC and/or UBH in hopes of convincing them to see reason and listen to Megan's medical treaters.

31.    UHC and/or UBH did not listen to reason or the attending physicians.

32.    Repeatedly, they sent Plaintiffs rejection letters, denying coverage for these services.

33.    The letters from UHC and/or UBH denied coverage based upon the "UBH Level of Care Guideline."

34.    Under the terms of the Plan, coverage for health services is provided "if it is Medically Necessary."

35.    The term "Medically Necessary" is defined, in part, as being in accordance with generally accepted standards of care.

36.    However, on information and belief, the aforementioned UBH Level of Care Guideline, which was set by UBH and/or UHC, was itself in violation of the generally accepted standards of care, thereby improperly tainting Plaintiffs' coverage decision, in violation of the terms of the Plan.

37.    The rejection letters received by the Plaintiffs came from United Behavioral Health, and were so identified by United Behavioral Health's insignia atop each letter:



38.   The bottom of each rejection letter specifically identified, in bold, that Defendant UHC was the relevant insurer:

Appeals and Grievances P.O. Box 30512, Salt Lake City, UT 84130-0512
Fax (855) 312-1470
**Insurance coverage is provided by United HealthCare Services, Inc.**

39.   In rejection letter after rejection letter, UBH and/or UHC continually insisted that Megan was no longer a candidate for treatment under the Plan, because she did not present with a risk of harm.

40.   Knowing that this was not true, Betsy and Chris grew very suspicious.

41.   Betsy and Chris repeatedly pleaded with UHC and/or UBH to produce for their review the documents and conversations UHC and/or UBH was having with Megan's treatment facility and providers.

42.   Eventually, UHC and/or UBH sent these records to Betsy and Chris, although they were wildly disorganized, and out of order.

43.   The records Betsy and Chris received were shocking.

44.   Those records clearly show that Megan's attending physician had advised UHC and/or UBH that this treatment was medically necessary, explaining that:

- "[Megan] is exhibiting the behaviors that put her at risk of suicide."

- "[Megan] has a highly conflictual family situation, and <u>she cannot go home at this point</u>"

- "The key reason for the request for continued treatment is that the member has

urges for self injury."

- "[Megan] is unable to regulate her emotions."

- "[Megan's]… home environment…places her at risk for self harm."

45.    Further, the records even document that Megan's attending physician specifically called UHC and/or UBH to protest their repeated denials of care, and to indicate that average stays in the program are 80 days.

46.    UHC and/or UBH's repeated denials  for coverage, combined with the expressed urgency of Megan's physicians, suggest that her care was denied at least in part because Megan had not yet committed suicide.

47.    The records from UHC and/or UBH document that "[Megan] continues to report thoughts of self-harm, but she has been able to refrain from acting on them."

48.    For the Daniels family, April and May of 2017 were replete with repeated appeals for coverage from Betsy and Chris and corresponding denials of coverage from UHC and/or UBH.

49.    The parents submitted a third and final request. Their appeal included approximately 500 pages of relevant medical records and documentation verifying the acute and terrifying reality of Megan's mental illness.

50.    Shockingly, this third appeal was denied only one day after all of the relevant appeal materials were received.

51.    A final denial of coverage was received on May 9, 2017, and again identified the tainted Level of Care Guidelines as the impetus underlying the denial.

52.    Defendants have covered only $30,755.33 of this total cost, denying coverage for the vast majority of Megan's treatment.

53.    UHC has wrongfully and arbitrarily denied Plaintiffs claims for health coverage in violation of the terms of the Plan.

54.     UBH has wrongfully and arbitrarily denied Plaintiffs claims for health coverage in violation of the terms of the Plan.

55.     Defendants, each individually as well as cumulatively, have breached the insurance contract with Plaintiffs by refusing to pay or honor Plaintiffs claim for health coverage under the terms of its policy of insurance, the Plan.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT AGAINST DEFENDANT UHC

56.     As and for a first cause of action against Defendant UHC, Plaintiffs realleges and incorporates by reference herein all preceding paragraphs and further state:

57.     At all times relevant to this action, Plaintiffs fully complied with the terms and conditions of the Plan, including any and all conditions precedent and subsequent to Plaintiffs right to obtain coverage under the Plan.

58.     The aforementioned agreement between Plaintiffs and Defendant UHC was a validly and mutually assented to contractual arrangement which was supported by legal and valuable consideration.

59.     Plaintiffs fulfilled all of their contractual obligations and contingencies, including any and all conditions precedent to the contract between the parties.

60.     In contrast, Defendant UHC materially breached its obligations and duties arising under the agreement, in some or all of the following particulars:

- In failing to properly determine if the relevant care was in accordance with generally accepted standards of medical practice

- In failing to make proper reimbursement of claims made under the contract, when its obligation to make payment became reasonably clear;

- In acting in direct violation of the terms and conditions of the agreement;

- In dilatory and abusive claims handling practices;

8

- In placing unduly restrictive and self-serving interpretations on the processing of Plaintiffs' claims and through its claim handling practices; and

- By refusing to cover the treatment that Plaintiff Megan Daniels' treaters determined was necessary for her medical condition.

61.     Defendant UHC's failure to pay for Megan's care pursuant or approve coverage for her treatment under the Plan constitutes a breach of contract.

62.     As a direct and proximate result of UHC's breach of the Policy, the Plaintiffs have been damaged in an amount to be determined at trial.

### SECOND CAUSE OF ACTION – BAD FAITH AGAINST DEFENDANT UHC

63.      As and for a second cause of action Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

64.     By reason of the described policy of insurance and at all times material UHC stood in a "special fiduciary relationship" with the plaintiffs and owed the plaintiffs a duty of good faith and fair dealing. As a consequence, the plaintiffs had a right to be protected from acts of bad faith by UHC at all times prior to a determination of whether or not they were entitled to coverage for the medical care, described above, under the Plan.

65.     UHC had a duty to timely provide coverage for the medical treatment necessitated by Megan's health condition, as detailed above.

66.     UHC refused to cover this treatment, even when Megan's doctors specifically informed UHC that she was a suicide risk if she were to forego treatment at Nashotah.

67.     UHC refused to cover this treatment, even though it was in accordance with generally accepted standards of medical practice.

68.     Regardless of Megan's doctors' efforts, as well as the efforts of Betsy and Chris, UHC refused to cover Megan's ongoing treatment under the Plan.

69.     UHC had no reasonable basis to deny coverage for Megan's treatment.

70.     In failing to cover Megan's ongoing treatment at Nashotah, UHC breach its contract and violated its duty of good faith and fair dealing, putting its monetary interests ahead of its heightened obligation to the plaintiffs.

71.     As a consequence of UHC's violation of its duty of good faith and fair dealing, the plaintiffs were required to incur substantial delay in receipt of benefits due under the Plan, and incur substantial additional expense, including attorneys' fees, in now developing and prosecuting their right to such benefits through litigation, all to plaintiffs' damage in an amount to be determined by a jury and/or the Court according to law.

## THIRD CAUSE OF ACTION – VIOLATION OF § 628.46 AGAINST DEFENDANT UHC

72.     As and for a third cause of action against Defendant UHC

73.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

74.     UHC failed to pay Plaintiffs benefits claim within thirty days of receiving requisite notice.

75.     UHC's failure to timely pay is a breach of Wis. Stat. § 628.46.

76.     As a result of UHC's failure to timely pay for Plaintiffs' claim, the Plaintiffs have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION – BREACH OF CONTRACT AGAINST DEFENDANT UBH

77.     As and for a fourth cause of action against Defendant UBH, Plaintiffs realleges and incorporates by reference herein all preceding paragraphs and further state:

78.     At all times relevant to this action, Plaintiffs fully complied with the terms and conditions of the Plan, including any and all conditions precedent and subsequent to Plaintiffs right to obtain coverage under the Plan.

10

79.     The aforementioned agreement between Plaintiffs and Defendant UBH was a validly and mutually assented to contractual arrangement which was supported by legal and valuable consideration.

80.     Plaintiffs fulfilled all of their contractual obligations and contingencies, including any and all conditions precedent to the contract between the parties.

81.     In contrast, Defendant UBH materially breached its obligations and duties arising under the agreement, in some or all of the following particulars:

- In failing to properly determine if the relevant care was in accordance with generally accepted standards of medical practice

- In failing to make proper reimbursement of claims made under the contract, when its obligation to make payment became reasonably clear;

- In acting in direct violation of the terms and conditions of the agreement;

- In dilatory and abusive claims handling practices;

- In placing unduly restrictive and self-serving interpretations on the processing of Plaintiffs' claims and through its claim handling practices; and

- By refusing to cover the treatment that Plaintiff Megan Daniels' treaters determined was necessary for her medical condition.

82.     Defendant UBH's failure to pay for Megan's care pursuant or approve coverage for her treatment under the Plan constitutes a breach of contract.

83.     As a direct and proximate result of UHC's breach of the Policy, the Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION – BAD FAITH AGAINST DEFENDANT UBH

84.     As and for a fifth cause of action Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

85.     By reason of the described policy of insurance and at all times material UBH stood in a "special fiduciary relationship" with the plaintiffs and owed the plaintiffs a duty of good faith and fair dealing. As a consequence, the plaintiffs had a right to be protected from acts of bad faith by UBH at all times prior to a determination of whether or not they were entitled to coverage for the medical care, described above, under the Plan.

86.     UBH had a duty to timely provide coverage for the medical treatment necessitated by Megan's health condition, as detailed above.

87.     UBH refused to cover this treatment, even when Megan's doctors specifically informed UBH that she was a suicide risk if she were to forego treatment at Nashotah.

88.     UBH refused to cover this treatment, even though it was in accordance with generally accepted standards of medical practice.

89.     Regardless of Megan's doctors' efforts, as well as the efforts of Betsy and Chris, UBH refused to cover Megan's ongoing treatment under the Plan.

90.     UBH had no reasonable basis to deny coverage for Megan's treatment.

91.     In failing to cover Megan's ongoing treatment at Nashotah, UBH breach its contract and/or violated its duty of good faith and fair dealing, putting its monetary interests ahead of its heightened obligation to the plaintiffs.

92.     As a consequence of UBH's violation of its duty of good faith and fair dealing, the plaintiffs were required to incur substantial delay in receipt of benefits due under the Plan, and incur substantial additional expense, including attorneys' fees, in now developing and prosecuting their right to such benefits through litigation, all to plaintiffs' damage in an amount to be determined by a jury and/or the Court according to law.

A.App. 124

**SIXTH CAUSE OF ACTION – VIOLATION OF § 628.46 AGAINST DEFENDANT UBH**

93.     As and for a fifth cause of action Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein

94.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

95.     UBH failed to pay Plaintiffs benefits claim within thirty days of receiving requisite notice.

96.     UBH failure to timely pay is a breach of Wis. Stat. § 628.46.

97.     As a result of UBH's failure to timely pay for Plaintiffs' claim, the Plaintiffs have been damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION – PUNITIVE DAMAGES AGAINST ALL DEFENDANTS**

98.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

99.     Defendants' conduct was undertaken intentionally and/or with reckless disregard for the consequences of its actions and/or represented a pattern of such conduct to the plaintiffs and others similarly situated so as to permit a jury to determine that Defendants are liable for punitive damages.

WHEREFORE, Plaintiffs prays for the following relief:

1.     A demand for trial by a six-person jury.

2.     An award of compensatory damages that will justly compensate the Plaintiffs for their losses.

3.     An award for reasonable attorneys' fees and costs incurred in this action.

4.     Pre-judgment interest and post-judgment interest.

5.     Punitive Damages.

6.      Any other relief the Court deems just and equitable.

Dated this 6th day of February, 2020.

GINGRAS, THOMSEN & WACHS

Electronically Signed By /s/ Robert J. Gingras
Robert J. Gingras
State Bar No.: 1002909
Scott B. Thompson
State Bar No.: 1098161
8150 Excelsior Drive
Madison, WI 53717
P: (608) 833-2632
F: (608) 833-2874
gingras@gtwlawyers.com
sthompson@gtwlawyers.com
Attorneys for the Plaintiffs

***Health Services from Non-Network Providers Paid as Network Benefits***

If specific Covered Health Services are not available from a Network provider, you may be eligible to receive Network Benefits from a non-Network provider. In this situation, your Network Physician will notify Personal Health Support, and they will work with you and your Network Physician to coordinate care through a non-Network provider.

When you receive Covered Health Services through a Network Physician, the Plan will pay Network Benefits for those Covered Health Services, even if one or more of those Covered Health Services is received from a non-Network provider.

---

**Looking for a Network Provider?**
In addition to other helpful information, **www.myuhc.com,** UnitedHealthcare's consumer website, contains a directory of health care professionals and facilities in UnitedHealthcare's Network. While Network status may change from time to time, **www.myuhc.com** has the most current source of Network information. Use **www.myuhc.com** to search for Physicians available in your Plan.

---

***Network Providers***

UnitedHealthcare or its affiliates arrange for health care providers to participate in a Network. At your request, UnitedHealthcare will send you a directory of Network providers free of charge. Keep in mind, a provider's Network status may change. To verify a provider's status or request a provider directory, you can call UnitedHealthcare at the toll-free number on your ID card or log onto **www.myuhc.com**.

Network providers are independent practitioners and are not employees of School District of South Milwaukee or UnitedHealthcare.

UnitedHealthcare's credentialing process confirms public information about the providers' licenses and other credentials, but does not assure the quality of the services provided.

***Possible Limitations on Provider Use***

If UnitedHealthcare determines that you are using health care services in a harmful or abusive manner, you may be required to select a Network Physician to coordinate all of your future Covered Health Services. If you don't make a selection within 31 days of the date you are notified, UnitedHealthcare will select a Network Physician for you. In the event that you do not use the Network Physician to coordinate all of your care, any Covered Health Services you receive will be paid at the non-Network level.

## Eligible Expenses

School District of South Milwaukee has delegated to UnitedHealthcare the discretion and authority to decide whether a treatment or supply is a Covered Health Service and how the Eligible Expenses will be determined and otherwise covered under the Plan.

Eligible Expenses are the amount UnitedHealthcare determines that UnitedHealthcare will pay for Benefits. For Network Benefits, you are not responsible for any difference between Eligible Expenses and the amount the provider bills. For Non-Network Benefits, you are responsible for paying, directly to the non-Network provider, any difference between the

# SECTION 4 - PERSONAL HEALTH SUPPORT

> **What this section includes:**
> - An overview of the Personal Health Support program; and
> - Covered Health Services for which you need to contact Personal Health Support.

UnitedHealthcare provides a program called Personal Health Support designed to encourage personalized, efficient care for you and your covered Dependents.

Personal Health Support Nurses center their efforts on prevention, education, and closing any gaps in your care. The goal of the program is to ensure you receive the most appropriate and cost-effective services available.

If you are living with a chronic condition or dealing with complex health care needs, UnitedHealthcare may assign to you a primary nurse, referred to as a Personal Health Support Nurse to guide you through your treatment. This assigned nurse will answer questions, explain options, identify your needs, and may refer you to specialized care programs. The Personal Health Support Nurse will provide you with their telephone number so you can call them with questions about your conditions, or your overall health and well-being.

Personal Health Support Nurses will provide a variety of different services to help you and your covered family members receive appropriate medical care. Program components are subject to change without notice. As of the publication of this SPD, the Personal Health Support Nurse program includes:

- **Admission counseling** - Nurse Advocates are available to help you prepare for a successful surgical admission and recovery. Call the number on the back of your ID card for support~~For upcoming inpatient Hospital admissions for certain conditions, a Treatment Decision Support Nurse may call you to help answer your questions and to make sure you have the information and support you need for a successful recovery~~.

- **Inpatient care management** - If you are hospitalized, a nurse will work with your Physician to make sure you are getting the care you need and that your Physician's treatment plan is being carried out effectively.

- **Readmission Management** - This program serves as a bridge between the Hospital and your home if you are at high risk of being readmitted. After leaving the Hospital, if you have a certain chronic or complex condition, you may receive a phone call from a Personal Health Support Nurse to confirm that medications, needed equipment, or follow-up services are in place. The Personal Health Support Nurse will also share important health care information, reiterate and reinforce discharge instructions, and support a safe transition home.

- **Risk Management** - Designed for participants with certain chronic or complex conditions, this program addresses such health care needs as access to medical specialists, medication information, and coordination of equipment and supplies. Participants may receive a phone call from a Personal Health Support Nurse to discuss

and share important health care information related to the participant's specific chronic or complex condition.

If you do not receive a call from a Personal Health Support Nurse but feel you could benefit from any of these programs, please call the toll-free number on your ID card.

### Prior Authorization

UnitedHealthcare requires prior authorization for certain Covered Health Services. In general, Physicians and other health care professionals who participate in a Network are responsible for obtaining prior authorization. However, if you choose to receive Covered Health Services from a non-Network provider, you are responsible for obtaining prior authorization before you receive the services. Services for which prior authorization is required are identified below and in Section 6, *Additional Coverage Details* within each Covered Health Service category.

It is recommended that you confirm with UnitedHealthcare that all Covered Health Services listed below have been prior authorized as required. Before receiving these services from a Network provider, you may want to contact UnitedHealthcare to verify that the Hospital, Physician and other providers are Network providers and that they have obtained the required prior authorization. Network facilities and Network providers cannot bill you for services they fail to prior authorize as required. You can contact UnitedHealthcare by calling the toll-free telephone number on the back of your ID card.

When you choose to receive certain Covered Health Services from non-Network providers, you are responsible for obtaining prior authorization before you receive these services. Note that your obligation to obtain prior authorization is also applicable when a non-Network provider intends to admit you to a Network facility or refers you to other Network providers.

To obtain prior authorization, call the toll-free telephone number on the back of your ID card. This call starts the utilization review process. Once you have obtained the authorization, please review it carefully so that you understand what services have been authorized and what providers are authorized to deliver the services that are subject to the authorization.

The utilization review process is a set of formal techniques designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures or settings. Such techniques may include ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, retrospective review or similar programs.

### Covered Health Services which Require Prior Authorization

**Please note that prior authorization is required even if you have a referral from your Primary Physician to seek care from another Network Physician.**

Network providers are generally responsible for obtaining prior authorization from Personal Health Support before they provide certain services to you. However, there are some

SCHOOL DISTRICT OF SOUTH MILWAUKEE MEDICAL CHOICE PLUS PLAN 1

## SECTION 6 - ADDITIONAL COVERAGE DETAILS

> **What this section includes:**
> - Covered Health Services for which the Plan pays Benefits; and
> - Covered Health Services that require you to obtain prior authorization from Personal Health Support before you receive them, and any reduction in Benefits that may apply if you do not call Personal Health Support.

This section supplements the second table in Section 5, *Plan Highlights*.

While the table provides you with Benefit limitations along with Copayment, Coinsurance and Annual Deductible information for each Covered Health Service, this section includes descriptions of the Benefits. These descriptions include any additional limitations that may apply, as well as Covered Health Services for which you must call Personal Health Support. The Covered Health Services in this section appear in the same order as they do in the table for easy reference. Services that are not covered are described in Section 8, *Exclusions*.

### Ambulance Services

The Plan covers Emergency ambulance services and transportation provided by a licensed ambulance service to the nearest Hospital that offers Emergency Health Services. See Section 14, *Glossary* for the definition of Emergency.

Ambulance service by air is covered in an Emergency if ground transportation is impossible, or would put your life or health in serious jeopardy. If special circumstances exist, UnitedHealthcare may pay Benefits for Emergency air transportation to a Hospital that is not the closest facility to provide Emergency Health Services.

The Plan also covers transportation provided by a licensed professional ambulance (either ground or air ambulance, as UnitedHealthcare determines appropriate) between facilities when the transport is:

- from a non-Network Hospital to a Network Hospital;
- to a Hospital that provides a higher level of care that was not available at the original Hospital;
- to a more cost-effective acute care facility; or
- from an acute facility to a sub-acute setting.

> In most cases, UnitedHealthcare will initiate and direct non-Emergency ambulance transportation. If you are requesting non-Emergency ambulance services, please remember that you must obtain prior authorization from Personal Health Support as soon as possible prior to the transport. If authorization from Personal Health Support is not obtained, you will be responsible for paying all charges and no Benefits will be paid.

**Autism Spectrum Disorder Services**

The following definitions apply for purposes of Autism Spectrum Disorders:

- "Intensive level services" means evidence-based behavioral therapies that is designed to help an individual with Autism Spectrum Disorder overcome the cognitive, social and behavioral deficits associated with that disorder. Intensive level services may include evidence-based speech therapy and occupational therapy provided by a qualified therapist when such therapy is based on, or related to, an individual's therapeutic goals and skills, and is concomitant with evidence-based behavioral therapy.

- "Non intensive level services" means evidence-based therapy that occurs after the completion of treatment for Intensive level services and that is designed to sustain and maximize gains made during treatment with Intensive level services or, for an individual who has not and will not receive intensive level services, evidence-based therapy that will improve the individual's condition.

## Intensive Level Services

Note: Benefits for intensive-level services begin after the enrolled Dependent child turns two years of age but prior to turning nine years of age. Benefits are provided for evidence-based behavioral intensive level therapy for an insured with a verified diagnosis of Autism Spectrum Disorder, the majority of which shall be provided to the enrolled Dependent child when the parent or legal guardian is present and engaged. The prescribed therapy must be consistent with all of the following requirements:

- Based upon a treatment plan developed by an individual who at least meets the requirements of a qualified intensive level provider or a qualified intensive level professional that includes at least 20 hours per week over a six-month period of time of evidence-based behavioral intensive therapy, treatment and services with specific cognitive, social, communicative, self-care, or behavioral goals that are clearly defined, directly observed and continually measured and that address the characteristics of Autism Spectrum Disorders. Treatment plans shall require that the enrolled Dependent child be present and engaged in the intervention.

- Implemented by qualified providers, qualified professional, qualified therapists or qualified paraprofessionals. Provided in an environment most conducive to achieving the goals of the enrolled Dependent child's treatment plan.

- Included training and consultation, participation in team meeting and active involvement of the enrolled Dependent child's family and treatment team for implementation of the therapeutic goals developed by the team.

- The enrolled Dependent child is directly observed by the qualified intensive level provider or qualified intensive level professional at least once every two months.

- Beginning after the enrolled Dependent child is two years of age and before the enrolled Dependent child is nine years of age.

- Intensive level services will be covered for up to four cumulative years. We may credit against any previous intensive level services the enrolled Dependent child received

against the required four years of intensive level services regardless of payer. We may also require documentation including medical records and treatment plans to verify any evidence-based behavioral therapy the insured received for Autism Spectrum Disorders that was provided to the enrolled Dependent child prior to attaining nine years of age. Evidence-based behavioral therapy that was provided to the enrolled Dependent child for an average of 20 or more hours per week over a continuous six-month period to be intensive-level services.

■ Travel time for qualified providers, supervising providers, professionals, therapists, paraprofessionals or behavioral analysts is not included when calculating the number of hours of care provided per week. We are not required to reimburse for travel time.

■ We require that progress be assessed and documented throughout the course of treatment. We may request and review the enrolled Dependent child's treatment plan and the summary of progress on a periodic basis.

■ We will cover services from a qualified therapist when services are rendered concomitant with intensive level evidence-based behavioral therapy and all of the following apply:

- The qualified therapist provides evidence-based therapy to an enrolled Dependent child who has a primary diagnosis of an Autism Spectrum Disorder.
- The enrolled Dependent child is actively receiving behavioral services from a qualified intensive level provider or qualified intensive level professional.
- The qualified therapist develops and implements a treatment plan consistent with their license and this section.

## Non-Intensive Level Services

Non intensive Level Services will be covered for an enrolled Dependent child with a verified diagnosis of Autism Spectrum Disorder for non-intensive level services that are evidence-based and are provided to an enrolled Dependent child by a qualified provider, qualified professional, qualified therapist or qualified paraprofessional in either of the following conditions:

■ After the completion of intensive level services and designed to sustain and maximize gains made during intensive level services treatment.

■ To an enrolled Dependent child who has not and will not receive intensive level services but for whom non-intensive level services will improve the enrolled Dependent child's condition.

Benefits will be provided for evidence-based therapy that is consistent with all of the following requirements:

■ Based upon a treatment plan developed by an individual who minimally meets the requirements as a qualified provider, qualified professional or qualified therapist that includes evidence-based specific therapy goals that are clearly defined, directly observed and continually measured and that address the characteristics of Autism Spectrum Disorders. Treatment plans shall require that the enrolled Dependent child be present and engaged in the intervention.

SCHOOL DISTRICT OF SOUTH MILWAUKEE MEDICAL CHOICE PLUS PLAN 1

- Implemented by qualified providers, qualified professionals, qualified therapist or qualified paraprofessionals.

- Provided in an environment most conducive to achieving the goal of the enrolled Dependent child's treatment plan.

- Included training and consultation, participation in team meetings and active involvement of the enrolled Dependent child's family in order to implement the therapeutic goals developed by the team.

- Non intensive level services may include direct or consultative services when provided by qualified providers, qualified supervising providers, qualified professionals, qualified paraprofessionals, or qualified therapists.

- We require that progress be assessed and documented throughout the course of treatment. We may request and review the enrolled Dependent child's treatment plan and the summary of progress on a periodic basis.

- Travel time for qualified providers, qualified supervising providers, qualified professional, qualified therapists, qualified paraprofessionals or qualified behavioral analysts is not included when calculating the number of hours of care provided per week. We are not required to reimburse for travel time.

Intensive level and non-intensive level services include but are not limited to speech, occupational and behavioral therapies.

The following services are not covered under the Autism Spectrum Disorders:

- Acupuncture.
- Animal-based therapy including hippotherapy.
- Auditory integration training.
- Chelation therapy.
- Child care fees.
- Cranial sacral therapy.
- Custodial or respite care.
- Hyperbaric oxygen therapy.
- Special diets or supplements.
- Pharmaceuticals and Durable Medical Equipment.

## Cancer Resource Services (CRS)

The Plan pays Benefits for oncology services provided by Designated Facilities participating in the Cancer Resource Services (CRS) program. Designated Facility is defined in Section 14, *Glossary*.

SCHOOL DISTRICT OF SOUTH MILWAUKEE MEDICAL CHOICE PLUS PLAN 1

*How to Appeal a Denied Claim*

If you wish to appeal a denied pre-service request for Benefits, post-service claim or a rescission of coverage as described below, you or your authorized representative must submit your appeal in writing within 180 days of receiving the adverse benefit determination. You do not need to submit Urgent Care appeals in writing. This communication should include:

- the patient's name and ID number as shown on the ID card;

- the provider's name;

- the date of medical service;

- the reason you disagree with the denial; and

- any documentation or other written information to support your request.

You or your authorized representative may send a written request for an appeal to:

UnitedHealthcare - Appeals
PO Box 30432
Salt Lake City, Utah 84130-0432

For Urgent Care requests for Benefits that have been denied, you or your provider can call UnitedHealthcare at the toll-free number on your ID card to request an appeal.

---

**Types of claims**
The timing of the claims appeal process is based on the type of claim you are appealing. If you wish to appeal a claim, it helps to understand whether it is an:

- urgent care request for Benefits;

- pre-service request for Benefits;

- post-service claim; or

- concurrent claim.

---

*Review of an Appeal*

UnitedHealthcare will conduct a full and fair review of your appeal. The appeal may be reviewed by:

- an appropriate individual(s) who did not make the initial benefit determination; and

- a health care professional with appropriate expertise who was not consulted during the initial benefit determination process.

Once the review is complete, if UnitedHealthcare upholds the denial, you will receive a written explanation of the reasons and facts relating to the denial.

A.App. 134

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| Megan Daniels, Betsy Daniels, Chris Daniels, | Case No. 3:19-cv-01038-wmc |
| Plaintiffs, | |
| vs. | **DECLARATION OF NGOC HAN NGUYEN IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| United Healthcare Services, Inc., | |
| Defendant. | |

I, Ngoc Han Nguyen, declare as follows:

1.    I am over eighteen years of age and am competent to testify.  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.    I work as a Legal Services Consultant for Optum, Inc. ("Optum").

3.    Optum and its affiliate companies, including Defendant United Healthcare Services, Inc., (collectively, "United") maintain computer systems containing the plan and administrative records related to members.  I understand that these systems and programs are kept and maintained by individuals with knowledge of their contents as part of United's regularly conduced business activities.  I am familiar with United's systems and programs and regularly access them in the course of my job duties.

4.    For the employer identified below, I identified the health plan document that covered Plaintiffs on the dates of service provided by Plaintiffs in the Complaint.

5.      Attached as **Exhibit 1** is a true and correct copy of the Summary Plan

Description ("SPD") for the School District of South Milwaukee Choice Plus Plan 1,

effective July 1, 2016, which was used to provide health benefits to participants,

including the Plaintiffs identified in the Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___15___ day of January 2020.


_____
Ngoc Han Nguyen

# EXHIBIT 1

# Summary Plan Description

**School District of South Milwaukee**
**Choice Plus Plan 1**

Effective: July 1, 2016~~5~~
Group Number: 710339



SCHOOL DISTRICT OF SOUTH MILWAUKEE MEDICAL CHOICE PLUS PLAN 1

## SECTION 1 - WELCOME

> **Quick Reference Box**
> - Member services, claim inquiries, Personal Health Support and Mental Health/Substance Use Disorder Administrator: (866)633-2446;
> - Claims submittal address: UnitedHealthcare - Claims, PO Box 30555, Salt Lake City, Utah 84130-0555; and
> - Online assistance: **www.myuhc.com**.

School District of South Milwaukee is pleased to provide you with this Summary Plan Description (SPD), which describes the health Benefits available to you and your covered family members. It includes summaries of:

- who is eligible;
- services that are covered, called Covered Health Services;
- services that are not covered, called Exclusions;
- how Benefits are paid; and
- your rights and responsibilities under the Plan.

> **IMPORTANT**
> The healthcare service, supply or Pharmaceutical Product is only a Covered Health Service if it is Medically Necessary. (See definitions of Medically Necessary and Covered Health Service in Section 14, *Glossary*.) The fact that a Physician or other provider has performed or prescribed a procedure or treatment, or the fact that it may be the only available treatment for a Sickness, Injury, Mental Illness, substance use disorder, disease or its symptoms does not mean that the procedure or treatment is a Covered Health Service under the Plan.

> School District of South Milwaukee intends to continue this Plan, but reserves the right, in its sole discretion, to modify, change, revise, amend or terminate the Plan at any time, for any reason, and without prior notice. This SPD is not to be construed as a contract of or for employment. If there should be an inconsistency between the contents of this summary and the contents of the Plan, your rights shall be determined under the Plan and not under this summary.

UnitedHealthcare is a private healthcare claims administrator. UnitedHealthcare goal is to give you the tools you need to make wise healthcare decisions. UnitedHealthcare also helps your employer to administer claims. Although UnitedHealthcare will assist you in many ways, it does not guarantee any Benefits. School District of South Milwaukee is solely responsible for paying Benefits described in this SPD.

Please read this SPD thoroughly to learn how the Plan works. If you have questions contact your local Human Resources department or call the number on the back of your ID card.

**How To Use This SPD**

■ Read the entire SPD, and share it with your family. Then keep it in a safe place for future reference.

■ Many of the sections of this SPD are related to other sections. You may not have all the information you need by reading just one section.

■ You can find copies of your SPD and any future amendments or request printed copies by contacting Human Resources.

■ Capitalized words in the SPD have special meanings and are defined in Section 14, *Glossary*.

■ If eligible for coverage, the words "you" and "your" refer to Covered Persons as defined in Section 14, *Glossary*.

■ School District of South Milwaukee is also referred to as Company.

■ If there is a conflict between this SPD and any benefit summaries (other than Summaries of Material Modifications) provided to you, this SPD will control.

Participant or be covered as a Dependent of the other person, but not both. In addition, if you and your Spouse are both covered under the Plan, only one parent may enroll your child as a Dependent.

A Dependent also includes a child for whom health care coverage is required through a Qualified Medical Child Support Order or other court or administrative order, as described in Section 13, *Other Important Information*.

## Cost of Coverage

You and School District of South Milwaukee share in the cost of the Plan. Your contribution amount depends on the Plan you select and the family members you choose to enroll.

Your contributions are deducted from your paychecks on a before-tax basis. Before-tax dollars come out of your pay before federal income and Social Security taxes are withheld - and in most states, before state and local taxes are withheld. This gives your contributions a special tax advantage and lowers the actual cost to you.

*Note:* The Internal Revenue Service generally does not consider Domestic Partners and their children eligible Dependents. Therefore, the value of School District of South Milwaukee's cost in covering a Domestic Partner may be imputed to the Participant as income. In addition, the share of the Participant's contribution that covers a Domestic Partner and their children may be paid using after-tax payroll deductions.

Your contributions are subject to review and School District of South Milwaukee reserves the right to change your contribution amount from time to time.

You can obtain current contribution rates by calling Human Resources.

## How to Enroll

To enroll, call Human Resources within 31 days of the date you first become eligible for medical Plan coverage. If you do not enroll within 31 days, you will need to wait until the next annual Open Enrollment to make your benefit elections.

Each year during annual Open Enrollment, you have the opportunity to review and change your medical election. Any changes you make during Open Enrollment will become effective the following July 1.

> **Important**
> If you wish to change your benefit elections following your marriage, birth, adoption of a child, placement for adoption of a child or other family status change, you must contact Human Resources within 31 days of the event. Otherwise, you will need to wait until the next annual Open Enrollment to change your elections.

| Post-Service Claims | |
|---|---|
| **Type of Claim or Appeal** | **Timing** |
| You must then provide completed claim information to UnitedHealthcare within: | **45 days** |
| UnitedHealthcare must notify you of the benefit determination: | |
| ■   if the initial claim is complete, within: | **30 days** |
| ■   after receiving the completed claim (if the initial claim is incomplete), within: | **30 days** |
| You must appeal an adverse benefit determination no later than: | **180 days** after receiving the adverse benefit determination |
| UnitedHealthcare must notify you of the first level appeal decision within: | **30 days** after receiving the first level appeal |
| You must appeal the first level appeal (file a second level appeal) within: | **60 days** after receiving the first level appeal decision |
| UnitedHealthcare must notify you of the second level appeal decision within: | **30 days** after receiving the second level appeal |

**Concurrent Care Claims**

If an on-going course of treatment was previously approved for a specific period of time or number of treatments, and your request to extend the treatment is an Urgent Care request for Benefits as defined above, your request will be decided within 24 hours, provided your request is made at least 24 hours prior to the end of the approved treatment. UnitedHealthcare will make a determination on your request for the extended treatment within 24 hours from receipt of your request.

If your request for extended treatment is not made at least 24 hours prior to the end of the approved treatment, the request will be treated as an Urgent Care request for Benefits and decided according to the timeframes described above. If an on-going course of treatment was previously approved for a specific period of time or number of treatments, and you request to extend treatment in a non-urgent circumstance, your request will be considered a new request and decided according to post-service or pre-service timeframes, whichever applies.

## Limitation of Action

You cannot bring any legal action against School District of South Milwaukee or the Claims Administrator to recover reimbursement until 90 days after you have properly submitted a request for reimbursement as described in this section and all required reviews of your claim have been completed. If you want to bring a legal action against School District of South Milwaukee or the Claims Administrator, you must do so within three years from the

expiration of the time period in which a request for reimbursement must be submitted or you lose any rights to bring such an action against School District of South Milwaukee or the Claims Administrator.

You cannot bring any legal action against School District of South Milwaukee or the Claims Administrator for any other reason unless you first complete all the steps in the appeal process described in this section. After completing that process, if you want to bring a legal action against School District of South Milwaukee or the Claims Administrator you must do so within three years of the date you are notified of the final decision on your appeal or you lose any rights to bring such an action against School District of South Milwaukee or the Claims Administrator.

School District of South Milwaukee and UnitedHealthcare may use individually identifiable information about you to identify for you (and you alone) procedures, products or services that you may find valuable. School District of South Milwaukee and UnitedHealthcare will use individually identifiable information about you as permitted or required by law, including in operations and in research. School District of South Milwaukee and UnitedHealthcare will use de-identified data for commercial purposes including research.

## Relationship with Providers

The relationships between School District of South Milwaukee, UnitedHealthcare and Network providers are solely contractual relationships between independent contractors. Network providers are not School District of South Milwaukee's agents or employees, nor are they agents or employees of UnitedHealthcare. School District of South Milwaukee and any of its employees are not agents or employees of Network providers, nor are UnitedHealthcare and any of its employees agents or employees of Network providers.

School District of South Milwaukee and UnitedHealthcare do not provide health care services or supplies, nor do they practice medicine. Instead, School District of South Milwaukee and UnitedHealthcare arranges for health care providers to participate in a Network and pay Benefits. Network providers are independent practitioners who run their own offices and facilities. UnitedHealthcare's credentialing process confirms public information about the providers' licenses and other credentials, but does not assure the quality of the services provided. They are not School District of South Milwaukee's employees nor are they employees of UnitedHealthcare. School District of South Milwaukee and UnitedHealthcare do not have any other relationship with Network providers such as principal-agent or joint venture. School District of South Milwaukee and UnitedHealthcare are not liable for any act or omission of any provider.

UnitedHealthcare is not considered to be an employer of the Plan Administrator for any purpose with respect to the administration or provision of benefits under this Plan.

School District of South Milwaukee is solely responsible for:

- enrollment and classification changes (including classification changes resulting in your enrollment or the termination of your coverage);
- the timely payment of Benefits; and
- notifying you of the termination or modifications to the Plan.

## Your Relationship with Providers

The relationship between you and any provider is that of provider and patient. Your provider is solely responsible for the quality of the services provided to you. You:

- are responsible for choosing your own provider;
- are responsible for paying, directly to your provider, any amount identified as a member responsibility, including Copayments, Coinsurance, any Annual Deductible and any amount that exceeds Eligible Expenses;

- access to cancer centers with expertise in treating the most rare or complex cancers; and

- education to help patients understand their cancer and make informed decisions about their care and course of treatment.

**CHD** – see Congenital Heart Disease (CHD).

**Claims Administrator** – UnitedHealthcare (also known as United HealthCare Services, Inc.) and its affiliates, who provide certain claim administration services for the Plan.

**Clinical Trial** – a scientific study designed to identify new health services that improve health outcomes. In a Clinical Trial, two or more treatments are compared to each other and the patient is not allowed to choose which treatment will be received.

**COBRA** – see Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

**Coinsurance** – the percentage of Eligible Expenses you are required to pay for certain Covered Health Services as described in Section 3, *How the Plan Works*.

**Company** – School District of South Milwaukee.

**Congenital Anomaly** – a physical developmental defect that is present at birth and is identified within the first twelve months of birth.

**Congenital Heart Disease (CHD)** – any structural heart problem or abnormality that has been present since birth. Congenital heart defects may:

- be passed from a parent to a child (inherited);

- develop in the fetus of a woman who has an infection or is exposed to radiation or other toxic substances during her Pregnancy; or

- have no known cause.

**Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)** – a federal law that requires employers to offer continued health insurance coverage to certain employees and their dependents whose group health insurance has been terminated.

**Copayment (or Copay)** – the set dollar amount you are required to pay for certain Covered Health Services as described in Section 3, *How the Plan Works*.

**Cosmetic Procedures** – procedures or services that change or improve appearance without significantly improving physiological function, as determined by the Claims Administrator. Reshaping a nose with a prominent bump is a good example of a Cosmetic Procedure because appearance would be improved, but there would be no improvement in function like breathing.

**Cost-Effective** – the least expensive equipment that performs the necessary function. This term applies to Durable Medical Equipment and prosthetic devices.

Physician. The fact that a provider is described as a Physician does not mean that Benefits for services from that provider are available to you under the Plan.

**Plan** – The School District of South Milwaukee Medical Plan.

**Plan Administrator** – School District of South Milwaukee or its designee.

**Plan Sponsor** – School District of South Milwaukee.

**Pregnancy** – includes prenatal care, postnatal care, childbirth, and any complications associated with the above.

**Private Duty Nursing** – nursing care that is provided to a patient on a one-to-one basis by licensed nurses in an inpatient or a home setting when any of the following are true:

- no skilled services are identified;
- skilled nursing resources are available in the facility;
- the skilled care can be provided by a Home Health Agency on a per visit basis for a specific purpose; or
- the service is provided to a Covered Person by an independent nurse who is hired directly by the Covered Person or his/her family. This includes nursing services provided on an inpatient or a home-care basis, whether the service is skilled or non-skilled independent nursing.

**Reconstructive Procedure** – a procedure performed to address a physical impairment where the expected outcome is restored or improved function. The primary purpose of a Reconstructive Procedure is either to treat a medical condition or to improve or restore physiologic function. Reconstructive Procedures include surgery or other procedures which are associated with an Injury, Sickness or Congenital Anomaly. The primary result of the procedure is not changed or improved physical appearance. The fact that a person may suffer psychologically as a result of the impairment does not classify surgery or any other procedure done to relieve the impairment as a Reconstructive Procedure.

**Residential Treatment Facility** – a facility which provides a program of effective Mental Health Services or Substance Use Disorder Services treatment and which meets all of the following requirements:

- it is established and operated in accordance with applicable state law for residential treatment programs;
- it provides a program of treatment under the active participation and direction of a Physician and approved by the Mental Health/Substance Use Disorder Administrator;
- it has or maintains a written, specific and detailed treatment program requiring full-time residence and full-time participation by the patient; and
- it provides at least the following basic services in a 24-hour per day, structured milieu:
  - room and board;

SCHOOL DISTRICT OF SOUTH MILWAUKEE MEDICAL CHOICE PLUS PLAN 1

## SECTION 16 - IMPORTANT ADMINISTRATIVE INFORMATION: ERISA

**What this section includes:**
- ■ Plan administrative information.

This section includes information on the administration of the medical Plan. While you may not need this information for your day-to-day participation, it is information you may find important.

*Additional Plan Description*

**Claims Administrator**: The company which provides certain administrative services for the Plan Benefits described in this Summary Plan Description.

United HealthCare Services, Inc.
9900 Bren Road East
Minnetonka, MN 55343

The Claims Administrator shall not be deemed or construed as an employer for any purpose with respect to the administration or provision of benefits under the Plan Sponsor's Plan. The Claims Administrator shall not be responsible for fulfilling any duties or obligations of an employer with respect to the Plan Sponsor's Plan.

**Type of Administration of the Plan**: The Plan Sponsor provides certain administrative services in connection with its Plan. The Plan Sponsor may, from time to time in its sole discretion, contract with outside parties to arrange for the provision of other administrative services including arrangement of access to a Network Provider; claims processing services, including coordination of benefits and subrogation; utilization management and complaint resolution assistance. This external administrator is referred to as the Claims Administrator. For Benefits as described in this Summary Plan Description, the Plan Sponsor also has selected a provider network established by United HealthCare Insurance Company. The named fiduciary of Plan is School District of South Milwaukee, the Plan Sponsor.

The Plan Sponsor retains all fiduciary responsibilities with respect to the Plan except to the extent the Plan Sponsor has delegated or allocated to other persons or entities one or more fiduciary responsibility with respect to the Plan.

A.App. 147